Marlee Goska (Alaska Bar No. 2305043)
Center for Biological Diversity
P.O. Box 1178
Homer, AK 99603
(907) 931-4775
mgoska@biologicaldiversity.org

Kristen Monsell (*pro hac vice application forthcoming*)
Center for Biological Diversity
2100 Franklin St., Suite 375
Oakland, CA 94612
(510) 844-7100
kmonsell@biologicaldiversity.org

*Attorneys for Plaintiffs*

[*Additional counsel listed on signature page*]

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| COOK INLETKEEPER, CHICKALOON VILLAGE TRADITIONAL COUNCIL, CENTER FOR BIOLOGICAL DIVERSITY, and ANNA-MARIA MUELLER,<br><br>       *Plaintiffs*,<br><br> v.<br><br>U.S. ARMY CORPS OF ENGINEERS, LIEUTENANT WILLIAM H. GRAHAM, Jr., in his official capacity as Chief of Engineers and Commanding General, U.S. Army Corps of Engineers, COLONEL JEFFREY S. PALAZZINI, in his official capacity as Commander of the U.S. Army Corps of Engineers, Alaska District,<br><br>       *Defendants*. | Case No. 3:25-cv-00097 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

(Endangered Species Act, 16 U.S.C. §§ 1531 *et seq*., National Environmental Policy Act, 42 U.S.C. § 4331, Clean Water Act, 33 U.S.C. § 1344, and Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*.)

# INTRODUCTION

1.	In this case, Plaintiffs Cook Inletkeeper, Center for Biological Diversity, Chickaloon Village Traditional Council, and Anna-Maria Mueller challenge Defendants the U.S. Army Corps of Engineers, et al.'s decision to permit a project that will support advanced mineral—primarily gold—exploration on private inholding lands surrounded by Lake Clark National Park. The inholding, known as the Johnson Tract, is situated at the headwaters of the Johnson River, at the base of the Iliamna Volcano on the west side of Cook Inlet. After entering Lake Clark National Park just a few miles from the proposed project site, the Johnson River drains into Cook Inlet approximately thirteen miles downriver. The Johnson River and the surrounding watershed are part of an intact coastal ecosystem that supports a remarkable array of fish, wildlife, and marine mammals. Tuxedni Bay and the Tuxedni subunit of the Alaska Maritime National Wildlife Refuge, including the Tuxedni Wilderness Area, are a few miles east of the Johnson Tract.

2.	Tuxedni Bay is designated as critical habitat for the Endangered Species Act (ESA)-listed Cook Inlet beluga whale. These highly imperiled whales frequent the area in the fall, winter, and spring. The bay is an essential foraging ground for the whale and is the only known location where they feed in the winter. Tuxedni Bay is also one of the only quiet refuges these noise-sensitive whales have left.

3.	In addition to belugas, this pristine area—the Johnson River valley, Tuxedni Bay, and the nearby Lake Clark National Park coastline—hosts a diversity of

other species. These include a dense congregation of brown bears; wolves; wolverines; all five species of Pacific salmon, which support the area's sport and commercial fisheries; hundreds of thousands of seabirds and shorebirds; and orcas, harbor porpoises, and humpback whales. The tidal area at the outlet of the Johnson River offers some of the best remaining razor clam beds in Cook Inlet, prized by local Tribal members.

4.     The Johnson Tract is owned by Cook Inlet Region, Inc. (CIRI). A mining company explored for gold at the Johnson Tract beginning in 1982 and established a camp, a 2,400-foot gravel airstrip, and a gravel road linking the airstrip to the camp. Mineral exploration of the Johnson Tract ceased in the 1990s. In 2019, after an extended period of inactivity, CIRI again leased the Johnson Tract for mineral exploration activities.

5.     In September 2024, Defendants granted Contango Ore, a private company, a Clean Water Act (CWA) section 404 permit for a project to facilitate advanced mineral exploration of the Johnson Tract. The project includes expansion of the existing airstrip and construction of an access road across the Johnson River and Double Glacier Creek, connecting the camp to a site known as the Johnson Deposit. There, Contango Ore plans to engage in advanced exploratory mining activities, including excavating a tunnel (or portal) to conduct underground drilling. The expanded airstrip would accommodate large, heavy aircraft flying into and out of the Johnson Tract, including flights over and around the nearby Tuxedni Bay—creating noise pollution where little currently exists.

6.     Defendants' decision to grant the permit is unlawful because Defendants failed to (1) engage in ESA section 7 consultation regarding potential effects to the Cook Inlet beluga whale, (2) take a hard look at the effects of the advanced mineral exploration project as required by the National Environmental Policy Act (NEPA), or (3) consider all impacts of the project on the aquatic environment as required by the CWA.

7.     Accordingly, the Court should vacate Defendants' August 21, 2024, Memorandum for Record and September 10, 2024, permit approving the Johnson Tract advanced mineral exploration project, POA-2023-00115, Johnson River.

## JURISDICTION AND VENUE

8.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (United States as a defendant), and 16 U.S.C. § 1540(c) and (g) (actions arising under the ESA citizen suit provision). Final agency action exists that is subject to judicial review pursuant to 5 U.S.C. § 704. An actual, justiciable controversy exists between Plaintiffs and Defendants. The Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 705–706.

9.     Venue is appropriate under 28 U.S.C. § 1391(e) because a substantial part of the events and omissions giving rise to this action occurred in this District.

10.     Plaintiffs provided notice of their intent to file this suit by letter to Defendants dated February 27, 2025. *See* 16 U.S.C. § 1540(g)(2). Defendants have not taken action to remedy their continuing violations by the date of this filing.

**PLAINTIFFS**

11.     Plaintiff COOK INLETKEEPER is a private nonprofit organization

dedicated to protecting the vast Cook Inlet watershed and the life it sustains. Since its

inception in 1995, Cook Inletkeeper has relied on research, education, and advocacy to

become a leader in watershed-based protections in the rich but threatened streams, lakes,

and estuaries of the Cook Inlet watershed. Among other efforts, Cook Inletkeeper was

lead petitioner in the effort to list the Cook Inlet beluga whale under the ESA and has led

and supported citizen-based science efforts to count, identify, and better understand the

whale. Cook Inletkeeper also submitted a petition to the National Marine Fisheries

Service (NMFS) in 2024 to establish a Cook Inlet Beluga Protection Zone in Tuxedni

Bay.

12.     Cook Inletkeeper's members have economic, recreational, aesthetic, moral,

and other interests in the area of the project. Its members appreciate and benefit from a

healthy and thriving Cook Inlet ecosystem, with abundant species and habitat and clean

waterways. For example, one Cook Inletkeeper member owns and operates Snug Harbor

Outpost. The Outpost is nestled on Chisik Island, across Tuxedni Channel from Lake

Clark National Park, and is located at the site of the Snug Harbor Cannery, which was

listed on the National Register of Historic Places on September 11, 2023. This member

derives deep personal enjoyment from spending time in this remote and pristine area and

its abundant marine ecosystem. He also regularly hosts guests at the Outpost, who come

to experience and learn about the natural beauty and unique maritime history of the area. These guests, in turn, support the upkeep and restoration of the historic cannery.

13. Defendants' decision to grant the permit without (1) taking a hard look at the project's impacts, including acid mine drainage and contaminant leaching, as NEPA requires, (2) engaging in ESA section 7 consultation, or (3) properly considering all the impacts of the project on the aquatic environment as the CWA requires harms this Cook Inletkeeper member (as well as other members). These include harms to this member's deep enjoyment of the tranquil ecosystems of Chisik Island, Tuxedni Bay, and the surrounding area, as well as the area's wildlife like Cook Inlet beluga whales, brown bears, and other animals, and his significant financial investment and countless hours of physical labor spent restoring the cannery and making it an attractive ecotourism destination. Defendants' permitting decision has caused this Cook Inletkeeper member and other members to suffer concrete and particularized harms to their economic, recreational, aesthetic, moral, and other interests in an intact Johnson River, Tuxedni Bay, and the Cook Inlet ecosystem, including thriving fish and wildlife populations. These injuries would be redressed by the relief requested in this Complaint.

14. Plaintiff CHICKALOON VILLAGE TRADITIONAL COUNCIL (CVTC) is the governing body of the federally recognized Chickaloon Native Village (the Tribe). The Tribe is a distinct, independent Indigenous community qualified to exercise powers of self-government by reason of original Tribal sovereignty as passed down from Nay'dini'aa Na'Kayax ancestors since time immemorial. CVTC acts and governs on

behalf of the Tribe's citizens and has a responsibility to provide for the safety, good health, and welfare of those citizens and to address community needs. CVTC is located in the Tikahtnu (Cook Inlet) region and ancestors of the Tribe's citizens have protected and stewarded the lands and waters of the Tikahtnu region for many thousands of years. The Johnson Tract, Tuxedni Bay, Chisik Island, the Johnson River watershed, and the Lake Clark National Park coastline are all within the Tikahtnu region and the Tribe's traditional ancestral territory and customary area of use. CVTC holds sacred its responsibility to ensure that customary and traditional ways of life, well-being, and food security are protected for current and future generations of Tribal citizens. CVTC has a cultural responsibility to promote, protect, and preserve the Tribe's ancestral homelands and all within them. This includes fish and wildlife relatives like Cook Inlet beluga whales, brown and black bears, wolves, wolverines, seabirds, shorebirds, salmon, herring, and many more species, as well as their habitat.

15.     CVTC and the Tribe's citizens have cultural, economic, moral, and other interests in the area of the project. Defendants' decision to grant the permit without (1) taking a hard look at the project's impacts, including from acid rock drainage and contaminants leaching, as NEPA requires, (2) engaging in ESA section 7 consultation, or (3) properly considering all the impacts of the project on the aquatic environment as the CWA requires harms Tribal citizens' interests in an intact Johnson River, Tuxedni Bay, and the Cook Inlet ecosystem, including thriving fish and wildlife populations. These include harms to their interests in clean Cook Inlet waters; healthy and thriving fish and

wildlife populations; and ensuring customary and traditional ways of life, well-being, and food security for current and future generations. These injuries would be redressed by the relief requested in this Complaint.

16.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the Center) is a national, nonprofit organization, with offices across the country, including Alaska. The Center has more than 93,000 active members. The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands, and public health. The Center has been actively involved in Alaska conservation issues since the early 1990s. In pursuit of its mission, the Center has been actively engaged in longstanding efforts to protect the Cook Inlet beluga whale and other Alaska-dwelling species from water and noise pollution, as well as disturbance from marine vessels and aircraft. One example of these efforts is a 2024 petition the Center submitted jointly with Cook Inletkeeper to NMFS to establish a Cook Inlet Beluga Protection Zone in Tuxedni Bay.

17.     The Center's members have economic, recreational, aesthetic, moral, and other interests in the area of the project. These members appreciate and benefit from thriving wildlife (including marine wildlife) and non-polluted habitat for viewing, photography, recreation, and research. For example, two Center members own and operate Silver Salmon Creek Lodge, a remote wilderness lodge located just south of the mouth of the Johnson River. Both members spend extensive time at and around the lodge each year, both for personal enjoyment and to provide hospitality services to guests. Both

members regularly partake in wildlife photography, fishing, and boating, and they take pride in managing their lodge in an ecologically sound manner. Guests visit the lodge from around the world to enjoy adventure-based outdoor activities in this pristine, wild Alaskan landscape, including sport fishing and observing and photographing bears, whales, and other wildlife, among other activities.

18. Defendants' decision to grant the permit without (1) taking a hard look at the project's impacts, including from acid rock drainage and contaminants leaching, as NEPA requires, (2) engaging in ESA section 7 consultation, or (3) properly considering all the impacts of the project on the aquatic environment as the CWA requires harms these Center members and other Center members. These include harms to their personal enjoyment of the rich and wild ecosystem around the lodge—including the Johnson River, Tuxedni Bay, Cook Inlet beluga whales, and other wildlife—as well as their economic interests in ensuring the lodge can continue to offer guests a pristine and untouched landscape with abundant fish and wildlife. Defendants' decision has caused the Center and its members to suffer concrete and particularized harms to their economic, recreational, aesthetic, moral, and other interests in an intact Johnson River, Tuxedni Bay, and Cook Inlet ecosystem, including thriving fish and wildlife populations. These injuries would be redressed by the relief requested in this Complaint.

19. Plaintiff ANNA-MARIA MUELLER is an individual who lives in Soldotna, Alaska, and is a member of the Center. Mueller has economic, recreational, aesthetic, and other interests in the area of the project. Mueller first visited Tuxedni Bay

in 1999, as part of a fisheries research project. Mueller was awestruck by the beauty of Lake Clark National Park when she first saw it and continues to derive great personal enjoyment from spending time in Tuxedni Bay and the surrounding area. In addition to returning to appreciate the natural beauty, wildlife, and pristine wild quality of the area, Mueller and her family also own and operate setnet lease sites in Tuxedni Channel, located near the mouth of Tuxedni Bay, between Chisik Island and the coast of Lake Clark National Park.

20.     Defendants' decision to grant the permit without (1) taking a hard look at the project's impacts, including from acid rock drainage and contaminants leaching, as NEPA requires, (2) engaging in ESA section 7 consultation, or (3) properly considering all the impacts of the project on the aquatic environment as the CWA requires has caused Mueller to suffer concrete and particularized harms. These include harms to Mueller's economic, recreational, aesthetic, moral, and other interests in the project area—including interests in a quiet, wild, and pristine Tuxedni Bay; a healthy, clean Johnson River; and thriving fish and wildlife populations. These injuries would be redressed by the relief requested in this Complaint.

## DEFENDANTS

21.     Defendant U.S. ARMY CORPS OF ENGINEERS (Corps) is a federal agency within the U.S. Department of Defense. The Corps is responsible for reviewing and issuing section 404 permits under the CWA, 33 U.S.C. § 1344. The Corps is required

to comply with federal laws, including the CWA, the ESA, NEPA, and the APA. The Corps issued the permit and Memorandum for Record challenged here.

22. Defendant LIEUTENANT WILLIAM H. GRAHAM, Jr., is the Chief of Engineers and Commanding General of the Corps and is sued in his official capacity. Lieutenant Graham is the federal official with the ultimate authority and responsibility for ensuring the Corps' compliance with federal laws, including the CWA, the ESA, NEPA, and the APA.

23. Defendant COLONEL JEFFREY S. PALAZZINI is the Commander of the Corps' Alaska District and is sued in his official capacity. As district commander, Colonel Palazzini is the Corps official responsible for the permit and Memorandum for Record challenged here.

## STATUTORY BACKGROUND

24. To issue the permit, the Corps had to comply with federal laws, including the CWA, the ESA, NEPA, and the APA.

### Clean Water Act

25. The CWA is designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA prohibits the discharge of pollutants, including dredged or fill material, into the waters of the United States unless authorized by a permit. *Id*. § 1311(a). Section 404 of the CWA authorizes the Corps to issue permits, after notice and opportunity for public comment, for the discharge of dredge or fill material into waters of the United States. *Id*. § 1344(a).

26.     The Environmental Protection Agency has promulgated regulations, known as the "404(b)(1) Guidelines," for section 404 permits. 40 C.F.R. pt. 230. "Fundamental to these Guidelines is the precept that dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern." *Id.* § 230.1(c). "For activities involving 404 discharges, a permit will be denied if the discharge that would be authorized by such permit would not comply with the Environmental Protection Agency's 404(b)(1) guidelines." 33 C.F.R. § 320.4(a)(1). The Corps must deny a 404 permit if "[t]here does not exist sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with these Guidelines." 40 C.F.R. § 230.12(a)(3)(iv).

27.     The 404(b)(1) Guidelines require the Corps to fully evaluate all impacts of the proposed activity on the aquatic environment, including (a) physical substrate; (b) water circulation, fluctuation, and salinity; (c) suspended particulate/turbidity; (d) contaminants; (e) aquatic ecosystems and organisms; (f) disposal sites; (g) cumulative effects; and (h) secondary effects. *Id.* § 230.11. Secondary effects "are effects on an aquatic ecosystem that are associated with a discharge of dredged or fill materials, but do not result from the actual placement of the dredged or fill material." *Id.* § 230.11(h). Thus, secondary effects are not limited in time or space to just the initial discharge but encompass all activities and impacts associated with the fill activities.

28.     The Corps must use these factual determinations regarding impacts of the proposed activity to make findings of compliance or non-compliance with the 404(b)(1) Guidelines' restrictions on discharge of dredged or fill material that "will cause or contribute to significant degradation of the waters of the United States." *Id*. § 230.10(c).

## Endangered Species Act

29.     Congress enacted the ESA in 1973 "to provide a program for the conservation of . . . endangered species and threatened species." 16 U.S.C. § 1531(b). Congress's "plain intent" in enacting the ESA "was to halt and reverse the trend toward species extinction, whatever the cost" and "to give endangered species priority over the 'primary missions' of federal agencies." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184–85 (1978).

30.     Toward these goals, the ESA directs the Secretary of Interior through the U.S. Fish and Wildlife Service and the Secretary of Commerce through NMFS (the expert agencies), as appropriate, to determine which species of plants and animals are "threatened" and "endangered" and place them on a list of protected species. 16 U.S.C. § 1533. An "endangered" or "threatened" species is one "in danger of extinction throughout all or a significant portion of its range" or "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range," respectively. *Id*. § 1532(6), (20).

31.     Once a species is listed, the ESA provides an array of procedural and substantive protections not provided by any other law. These protections include

designation of critical habitat, the preparation and implementation of recovery plans, the prohibition against the "taking" of listed species, and the requirement for interagency consultation. *Id*. §§ 1533(a)(3), (f), 1538(a), 1536.

32.     Section 9 of the ESA prohibits any person from "taking" an endangered species without proper authorization. *Id*. § 1538(a)(1)(B). The term "take" is statutorily defined broadly as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). "Take" includes both direct and indirect harm and it need not be purposeful. The take prohibition applies to any "person," *id*. § 1538(a)(1), including federal agencies, *id*. § 1532(13). The ESA further makes it unlawful for any person, including federal agencies and/or federal officials acting in their official capacity, to "cause to be committed" the take of a listed species. *Id*. § 1538(g).

33.     Section 7(a)(2) of the ESA contains the substantive requirement that all federal agencies ensure their actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [their designated critical] habitat." 16 U.S.C. § 1536(a)(2). "Jeopardize" is defined as "an action that reasonably would be expected . . . to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

34.     To comply with section 7's substantive mandate, federal agencies must consult with the relevant expert agency whenever their actions may affect a listed species.

16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). Agency actions include "*any* action authorized, funded, or carried out by [a federal] agency." 16 U.S.C. § 1536(a)(2) (emphasis added); *see also* 50 C.F.R. § 402.03. This includes the granting of permits. 50 C.F.R. § 402.02. The "may affect" standard includes "[a]*ny possible effect*, whether beneficial, benign, adverse or of an undetermined character." *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012) (en banc) (citation omitted). In meeting the requirements of section 7, both the action and expert agency must use the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d), (f), (g)(8).

35.     For each federal action, the action agency must ask the relevant expert agency whether the action area contains any (1) species listed or proposed for listing under the ESA or (2) designated or proposed critical habitat. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(c). "Action area" is defined as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02. If listed species may be present, the agency must prepare a "biological assessment" or engage in "informal consultation" with the relevant expert agency to determine whether the listed species or habitat may be affected by the proposed action. 16 U.S.C. § 1536(c)(1); 50 C.F.R. §§ 402.12, 402.13. During informal consultation, the expert agency may suggest modifications to the action that the action agency "could implement to avoid the likelihood of adverse effects to listed species or critical habitat." 50 C.F.R. § 402.13(b).

36.     Formal consultation is required unless (1) the action agency determines that its action "may affect" but is "not likely to adversely affect" a listed species or its critical habitat and (2) the expert agency concurs in writing with the action agency's determination. *Id*. § 402.14(a)–(b).

37.     If the action agency determines that its action is "likely to adversely affect" a listed species or its critical habitat, or if the expert agency does not concur with the action agency's "not likely to adversely affect" determination, the action and expert agencies must engage in "formal consultation." *Id*. § 402.14(a); *see also id*. § 402.02 (defining formal consultation). During formal consultation, the expert agency must consider (1) the aggregate effect of past and ongoing human activities ("environmental baseline"); (2) all consequences of the proposed action, including those that occur later in time ("effects of the action"); and (3) the effects of future state and private activities that are reasonably certain to occur ("cumulative effects"). *Id*. §§ 402.14(g), 402.02. The expert agency must consider these factors in context of the current status of the species and its habitat. *Id*. § 402.14(g).

38.     To complete formal consultation, the expert agency must provide the action agency with a "biological opinion" that explains how the proposed action will affect the listed species or habitat. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14(g), (h). The biological opinion must include the expert agency's determination on whether the proposed action is either likely or not likely "to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R.

§ 402.14(h)(1)(iv). The ESA's implementing regulations define "[j]eopardize the continued existence of" a listed species as "engag[ing] in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. "Destruction or adverse modification [of critical habitat] means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." *Id*. If the expert agency concludes that the proposed action will jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat, the biological opinion must outline "reasonable and prudent alternatives" to avoid jeopardy or adverse modification. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2).

39.    If the expert agency concludes that the action is reasonably certain to take listed members of the population but the action will not jeopardize the population, the expert agency must produce an incidental take statement that specifies the impact of the action, generally by setting a numeric limit on take and identifying "reasonable and prudent measures" that will minimize the impact of that take, among other requirements. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). In addition, when the endangered or threatened species to be taken are marine mammals, the take must first be authorized pursuant to the Marine Mammal Protection Act, 16 U.S.C. § 1543, and the incidental take statement must include any additional measures necessary to comply with the Marine

Mammal Protection Act take authorization, 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1)(iii). The take of a listed species in compliance with the terms of a valid incidental take statement is not prohibited under section 9 of the ESA. 16 U.S.C. § 1536(b)(4), (o)(2); 50 C.F.R. § 402.14(i)(6).

## National Environmental Policy Act

40.     NEPA "declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989) (citing 42 U.S.C. § 4331). NEPA does not mandate particular results but does prohibit uninformed agency action, directing agencies to (1) take a "hard look" at environmental consequences and (2) "provide for broad dissemination of relevant environmental information" to the public. *Id*. at 350–51; *see also* 42 U.S.C. § 4332(2)(C) (requirements for NEPA review). By instructing agencies to analyze the environmental consequences of a proposed action, NEPA's procedures ensure that important effects will not be "overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson*, 290 U.S. at 349 (citations omitted).

41.     NEPA requires agencies to prepare an environmental impact statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *accord id*. § 4336(b)(1). If a proposed agency action "does not have a reasonably foreseeable significant effect . . . or if the significance of [the] effect is unknown," the agency may instead prepare an environmental assessment (EA). *Id*. § 4336(b)(2).

42. In undertaking its NEPA analysis, a federal agency must "ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document" and "make use of reliable data and resources." *Id.* § 4332(2)(D), (E). NEPA also requires that the public receive the underlying environmental data from which the agency derived its opinion. *See* 42 U.S.C. § 4332(2)(C).

## Administrative Procedure Act

43. The APA grants a right of federal judicial review to any person who is "adversely affected or aggrieved by agency action." 5 U.S.C. § 702.

44. The APA provides that the "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or adopted "without observance of procedure required by law." *Id.* § 706(2)(A), (D).

## STATEMENT OF FACTS

### Johnson River, Tuxedni Bay, and Cook Inlet Beluga Whales

45. The Johnson Tract inholding is surrounded by Lake Clark National Park and situated in the headwaters of the Johnson River. The Johnson River crosses into Lake Clark National Park a few miles downriver and then empties into Cook Inlet approximately thirteen miles from the project site.

46. The Johnson River crosses into Lake Clark National Park a few miles downriver and then empties into Cook Inlet approximately thirteen miles from the project

site. The Johnson River watershed is pristine due to lack of past development. The Johnson River contains all five species of salmon as well as Dolly Varden. Among other species, black and brown bears, wolves, wolverine, moose, bald eagles, and trumpeter swans can be found in the Johnson River valley. The valley is important for the local bear-viewing economy. The coastal mud flats at the mouth of the Johnson River host razor clams prized by local Tribal members. This coastal area is also frequented by seabirds and shorebirds. Salmon in the Johnson River and Tuxedni Bay support sport and local commercial fisheries.



The Johnson River, looking upstream; Iliamna Volcano is on the left.
Photo: Center for Biological Diversity



The Johnson River entering Cook Inlet. Photo: Center for Biological Diversity

47.   The coastal area of Cook Inlet near the Johnson Tract contains critical habitat for the highly imperiled Cook Inlet beluga whale. NMFS designated Cook Inlet beluga whales as "depleted" under the Marine Mammal Protection Act in 2000, 65 Fed. Reg. 34,590 (May 31, 2000), and listed the whales as "endangered" under the ESA in 2008, 73 Fed. Reg. 62,919 (Oct. 22, 2008). In 2011, NMFS designated critical habitat for the species, including the coastline of Lake Clark National Park. 76 Fed. Reg. 20,180, 20,205 (Apr. 11, 2011) (Area 2).

48.   Included in the whale's critical habitat is Tuxedni Bay, just a few miles east of the Johnson Tract. Scientists recently confirmed the bay is one of the quietest and most pristine areas in Cook Inlet. The bay is the only known location where Cook Inlet belugas

forage in the winter. Belugas are found in the bay in the spring, fall, and winter. Belugas were historically common in the bay in the summer. Scientists have identified protecting Tuxedni Bay as one of the key actions needed for the whale's recovery.

49.     Beluga whales use "sound rather than sight for many important functions," such as to communicate, locate prey, and navigate. 76 Fed. at 20,203. The whales produce "high frequency sounds which they use as a type of sonar for finding and pursuing prey, and likely for navigating through ice-laden waters." *Id*. Cook Inlet beluga whales are vulnerable to harassment and injury from human-caused noise. This includes noise from vessels, aircraft, military detonations, seismic surveys, and industrial activities. Quiet areas with noise levels that do not interfere with the whale's important life history functions and behavior are necessary for the whale's survival and recovery. For these reasons, NMFS determined that "[w]aters with in-water noise below levels resulting in the abandonment of critical habitat areas by Cook Inlet beluga whales" are essential to the conservation of the species. *Id*.

50.     The ESA recovery plan for Cook Inlet beluga whales lists three high-concern threats: (1) catastrophic events (e.g., natural disasters; spills; mass strandings); (2) cumulative effects of multiple stressors; and (3) human-caused noise.

51.     NMFS has repeatedly recognized the effects of noise pollution from aircraft on Cook Inlet beluga whales, including in a 2019 biological opinion the agency issued on Hilcorp's oil and gas activities in Cook Inlet (Hilcorp BiOp), which included aircraft flights over the Cook Inlet. The Hilcorp BiOp states that "ground-based biologists note

that Cook Inlet belugas often dive and remain submersed for longer than is typical when aircraft fly past at low altitudes or circle them (NMFS unpublished data)" and "[a]ircraft have been observed to cause behavioral changes to groups of feeding beluga whales when the aircraft flew past at low altitudes or circled the groups." One study cited in the Hilcorp BiOp found that belugas in the Beaufort Sea modified their behavior when helicopters and small aircraft passed above them.

52.     Another more recent biological opinion on Furie's oil and gas activity in Cook Inlet (Furie BiOp) found that belugas can "be disturbed by the sound or physical presence of low-flying aircraft." The Furie BiOp noted that "[a]irborne noise and visual cues are more likely to disturb individuals resting at the sea surface," although belugas "underwater could also be disturbed by sound propagating beneath the surface or by the shadow of the aircraft overhead." The Furie BiOp relies on "the implementation of mitigation measures" to avoid adverse effects to belugas and other marine mammals from aircraft associated with Furie's activities.

53.     Recently, the U.S. Department of the Interior (Interior) completed informal section 7 consultation with NMFS regarding easement conveyances for the planning phase of (1) a haul road from the Johnson Tract across Lake Clark National Park and (2) a port on Tuxedni Bay. Through the consultation, NMFS and Interior developed mitigation measures for the planning phase activities, including restrictions on helicopters, other aircraft, and noise. For example, aircraft must operate at least 1,500 feet above sea level when within 500 lateral yards of marine mammals, and other noise-

producing activities on, in, or over Tuxedni Bay are prohibited between September 1 and May 15.

54.     None of these restrictions apply to aircraft flying over or around Tuxedni Bay as part of the Johnson Tract advanced mineral exploration project challenged here.

## The Memorandum for Record and Permit

55.     In 2019, CIRI signed an agreement with HighGold[1] for an initial ten-year lease of the Johnson Tract for the purpose of mineral exploration. That same year, HighGold reopened the mining camp that had been built in the 1980s and began conducting seasonal exploratory surface drilling.

56.     In 2023, HighGold applied for a CWA 404 permit from the Corps (POA-2023-00115, Johnson River), for the purpose of (1) expanding the existing airstrip to 5,000 feet in length with a width of 150 feet and adding a 400-by-300-foot access road through the Johnson River watershed, including 2 bridges and 23 culverts, to a site where a portal will be excavated and drilled as part of exploratory mining activities.

57.     The Corps published a Public Notice of Permit Application on June 16, 2023, with a public comment period extending until July 17. The Corps reopened the comment period on September 8 and extended it to November 8.

---

[1] In July of 2024, Contango acquired HighGold and all its assets, including the Johnson Tract lease agreement with CIRI and the CWA permit application with the Corps.

58.     Members of the public, non-governmental organizations, federally recognized Tribes, and federal agencies commented on the Public Notice. Commenters raised numerous concerns, including but not limited to:

a.  impacts to water quality, scenery, wildlife, subsistence, and salmon;

b.  impacts to ESA-listed Cook Inlet beluga whales and their critical habitat;

c.  disruption to the local bear-viewing economy;

d.  runoff from acid generating rock; and

e.  noise pollution, including from helicopters and other aircraft.

59.     More than 300 commenters, including two Tribes and the National Park Service, requested that the Corps to hold a public hearing on the permit application. The Corps declined to hold a public hearing.

60.     The Corps did not publish a draft EA for public comment or initiate government-to-government consultation with Tribal nations on a draft EA.

61.     On August 21, 2024, the Corps issued a Memorandum for Record for the permit application, consisting of a combined Environmental Assessment, Section 404(b)(1) Guidelines Evaluation, Public Interest Review, and Statement of Findings.

62.     The project activities include the construction of a 5,000-foot expanded airstrip. Expansion of the airstrip will allow larger aircraft to land in the Johnson Tract. Expansion of the airstrip will accommodate heavy aircraft landing in the Johnson Tract. Expansion of the airstrip will increase air traffic to the Johnson Tract. Aircraft flying from Anchorage to the Johnson Tract will fly over or near Tuxedni Bay. Aircraft

approaching the Johnson Tract to land will fly at low altitudes over or near Tuxedni Bay. Cook Inlet beluga whales have designated critical habitat along Lake Clark National Park's coastal areas and in Tuxedni Bay. Tuxedni Bay is an important foraging area for endangered Cook Inlet beluga whales. Tuxedni Bay is approximately ten miles east of the Johnson Tract.

63.    Despite the Cook Inlet beluga's sensitivity to human-caused noise, including low-flying aircraft, the Corps did not engage in informal or formal ESA consultation regarding the effects of the project on Cook Inlet beluga whales or the species' designated critical habitat. Instead, the Corps concluded that section 7 ESA consultation was not required because there are no listed or proposed species or critical habitat present or in the vicinity of the action area. The Corps determined the ESA action area is limited to (1) the airstrip, road, and portal site; (2) an area of 300 feet surrounding the project components; and (3) the aquatic environment of the Johnson River headwaters up to 3 miles downstream of the project. In response to comments requesting the Corps consider impacts to Tuxedni Bay, Cook Inlet belugas, and their critical habitat, the Corps stated that the "action area for this proposed project does not extend into Tuxedni Bay or the Cook Inlet, which is where beluga whales and their critical habitat . . . are located."

64.    The project activities also include the construction of a 2.3-mile access road that will connect the mining camp and expanded airstrip, which are on the south side of the Johnson River, to a proposed exploration portal site on the north side of the river. Construction of the portal access road and the expanded airstrip requires the discharge of

67,800 cubic yards of general embankment fill and 5,200 cubic yards of surfacing material into 5.14 acres of wetlands, streams, and creeks. Construction will also impact 1,800 linear feet of streams through the installation of culverts. Contango Ore plans to use fill sourced from material sites in the vicinity of the project for construction of the road and airstrip. The Memorandum for Record does not disclose or analyze the number or location of material sites that will be disturbed. According to the mitigation plan accompanying the permit, Contango Ore plans to blast and crush bedrock material from at least one material site. The Memorandum for Record does not disclose or analyze the blasting or crushing of bedrock from a material site.

65.    The purpose of the project is for Contango Ore to more easily access the Johnson Deposit. There, Contango Ore plans to excavate an exploration portal, or tunnel, removing approximately 99,400 cubic yards of rock. Contango Ore will then conduct underground drilling within the exploration portal. The foreseeable effects of the portal excavation are within the NEPA scope of analysis for the permit. The excavated rock will be used to construct other components of the project. The Memorandum for Record does not disclose or analyze the other components for which the excavated rock will be used. The Memorandum for Record does not disclose or analyze where the excavated rock will be placed. The mitigation plan accompanying the permit references a "waste rock disposal site," which is not disclosed or analyzed in the Memorandum for Record.

66.    Regarding the potential for acid mine drainage and contaminant leaching from fill used to construct the road and rock excavated from the exploration tunnel, the

Memorandum for Record states, "[t]he applicant has conducted technical analyses to assess the acid rock drainage (ARD) and metal leaching (ARD/ML) potential of the rock being disturbed. Acid Base Accounting (ABA) sampling has been conducted for material sites, and all samples were classified as non-acid generating." Memorandum for Record at 28. The Memorandum for Record also states that "[a] sample was specifically taken to represent the rock that will be intersected from the proposed project, as well as some surface samples from around the portal site." *Id.*

67. The Memorandum for Record does not disclose or analyze how many samples the applicant took or tested. The Memorandum for Record does not disclose or analyze the specific location(s) where the samples were taken. The Memorandum for Record does not present or analyze any specific information relating to the technical analyses the applicant conducted for the material sites. The Memorandum for Record also does not disclose whether testing of the metal leaching potential of the rock being disturbed was undertaken and analyzed separately from the acid base accounting testing. Metal and other contaminant leaching potential must be analyzed separately from acid base accounting testing because rocks can have a low acid generation potential but still leach harmful amounts of metals and other contaminants.

68. The Memorandum for Record references a 2003 study of the geochemistry of the Johnson River conducted by the United States Geological Survey (USGS). The USGS study sampled eleven rocks in the Johnson River and concluded they "indicated low acid-generating potential and high acidity neutralizing potential." The Memorandum

for Record does not disclose or analyze other relevant information in the USGS study. The Memorandum for Record does not disclose or analyze the USGS study's statement that its sampling results "should be used with caution because similar tests were not done on rocks from narrow veins or faults that could have acid generating potential." Nor did the Memorandum for Record disclose or analyze the USGS study's uncertainty regarding "how much unoxidized pyrite remains beneath the oxidized rock surface, awaiting exposure by landslides or human activity." Pyrite is a primary source of acid mine drainage.

69. Regarding acid base accounting testing of the rock that will be excavated for the portal, the Memorandum for Record states that "[a] sample was specifically taken to represent the rock that will be intersected from the proposed project, as well as some surface samples from around the portal site." The Memorandum for Record does not disclose the underlying data on which the Corps relied in reaching this conclusion. The Memorandum for Record does not disclose or analyze how many samples were taken from the area that will be excavated from the portal. The Memorandum for Record does not disclose or analyze the locations or depth the samples were taken from. The Memorandum for Record adopts the applicant's conclusions regarding acid mine drainage and contaminant leaching potential of the project activities, stating that the results were "circumneutral, low-Sulphur, and non-potentially acid draining," and "contained low metal content."

70.     The Environmental Evaluation Document the applicant submitted to the Corps cites a report titled pHase Geochemistry (2023). The Environmental Evaluation Document describes this report as containing a technical analysis of the acid rock drainage and metal leaching potential of the rock that will be disturbed by the project activities. The applicant's Environmental Evaluation Document "briefly summarize[s]" the pHase Geochemistry (2023) report. The Environmental Evaluation Document states that while the samples showed low potential for acid mine drainage, one sample, "sample 5," was a possible exception. The Memorandum for Record does not disclose sample 5 or a sample result showing a "possible exception." The Memorandum for Record instead concludes that "[a]ll tests have confirmed that samples are low in metal and have no potential for acid generation." The Environmental Evaluation Document also states the applicant intended to carry out "resampling" in 2023. The Memorandum for Record does not disclose or analyze any "resampling" the applicant may have carried out.

71.     In a December 2, 2024, email to the Center, the Corps stated that the applicant did not give the pHase Geochemistry (2023) report to the Corps. The Corps did not review the pHase Geochemistry (2023) report as part of the NEPA analysis it conducted for the permit. The Memorandum for Record does not disclose or analyze the pHase Geochemistry (2023) report. The Memorandum for Record also states that all the applicant's data relating to the potential for acid mine generation and metal leaching will be reviewed by the Alaska Department of Environmental Conservation. The Alaska

Department of Environmental Conservation has not received or reviewed the pHase
Geochemistry (2023) report.

72.     Other information that was before the Corps, including a 2022 report
prepared by HighGold, also contradict the conclusions in the Memorandum for Record
related to acid drainage and contaminant leaching potential of the project activities. The
2022 HighGold report shows that the Johnson Deposit contains sulfide minerals,
including pyrite (the most common source of acid mine drainage), chalcopyrite,
sphalerite, and galena—two of which generate acid (pyrite and chalcopyrite) and all of
which leach harmful metals when dissolved. Carbonate minerals, primarily calcite, are
the best acid neutralizing materials. While the 2022 HighGold report shows there is a thin
layer of limestone (calcium carbonate or calcite) present in the Johnson Deposit, this
layer is stratigraphically below the area targeted for drilling and is only approximately
five meters thick. This layer of limestone would therefore provide little neutralizing
ability.

73.     As explained in the 2003 USGS study, the alkalinity level of a waterway
indicates its buffering capacity, or the ability of the substances dissolved in the water to
neutralize acids, including acid mine drainage. The USGS study tested alkalinity
concentrations in the Johnson River and the results show low alkalinity, indicating that its
waters have a low buffering capacity. The applicant provided water quality results from
streams in the Johnson River watershed to the Corps, which do not include information
regarding alkalinity.

74.     The Memorandum for Record did not disclose or analyze the effects of seepage from the exploration portal that Contango plans to excavate. The applicant's Environmental Evaluation Document states that it expects seepage into the exploration portal. Information shared publicly by HighGold in 2023 indicates the planned exploration portal will have a downward slope. This means any mine seepage, including seepage of acid-generating sulfide minerals, will flow downhill out of the portal entrance. Once the mine seepage has exited the portal, it may continue to flow downhill and contaminate nearby streams, wetlands, and the Johnson River.

75.     Plaintiff Mueller raised this issue in her comment on the Public Notice:

> The proposed advanced exploration [portal] has a downhill gradient. Any mine seepage will want to drain from the [portal]. Since there are sulfide minerals present, this drainage could be contaminated by acid drainage. How will this be addressed? [A portal] with an uphill gradient would be a more responsible design, so that after exploration is completed, even if the mine fills with water, it may not discharge.

The Corps did not acknowledge or respond to Plaintiff Mueller's comment.

76.     The Corps concluded in the Memorandum for Record that the project activities will have no significant impact on the quality of the human environment. The Corps also made factual determinations pursuant to the 404(b)(1) Guidelines of no effect or minor effects on the aquatic environment.

77.     The Corps issued permit number POA-2023-00115, Johnson River, to Contango Ore on September 9, 2024. The permit authorizes Contango Ore to "[d]ischarge 67,800 cubic yards of fill and 5,200 cubic yards of surfacing material into

5.14 acres of waters of the U.S. (WOTUS), including wetlands, and to impact 1,800 linear feet of streams by installing culverts."

## CLAIMS FOR RELIEF

### First Claim for Relief
### (Endangered Species Act)

78.    Plaintiffs incorporate and adopt by reference each of the allegations in paragraphs 1 to 77.

79.    Cook Inlet beluga whales are listed as endangered under the ESA. Cook Inlet belugas are extremely sensitive to human-caused noise, including noise from aircraft. Low-flying aircraft in particular are known to elicit negative behavioral responses from belugas.

80.    Designated critical habitat for Cook Inlet belugas extends along the Lake Clark National Park coastline, including Tuxedni Bay. New scientific information published in July 2024 identifies Tuxedni Bay as the only known location where Cook Inlet belugas forage in the winter. The relative quiet of Tuxedni Bay means belugas are "highly sensitive to further noise disturbance" in the area.

81.    The Corps' decision to grant the permit to Contango Ore is an agency action. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02. The permit authorizes, among other activities, the expansion of an existing airstrip to 5,000 feet. The expanded airstrip will be used to accommodate heavy aircraft, will allow for large aircraft to land, and will result in an increase in air traffic into and surrounding the Johnson Tract. Tuxedni Bay, just a

few miles to the east of the Johnson Tract, is in the direct flight path from Anchorage, the nearest metropolitan area to the Johnson Tract. Large, heavy, and increased numbers of aircraft flying into the Johnson Tract, particularly low-flying aircraft preparing to land, "may effect" Cook Inlet beluga whales and their critical habitat in Tuxedni Bay and Cook Inlet. *See* 16 U.S.C. § 1536(a)(2); 50 CFR § 402.14(a). NMFS, the expert agency responsible for protecting the Cook Inlet beluga whale, has repeatedly recognized the effects of aircraft on Cook Inlet beluga whales.

82.     The Corps did not engage in section 7 consultation under the ESA prior to issuing the permit. The Corps reached the conclusion that section 7 consultation was not required based on its determination that the action area for the project does not include Tuxedni Bay or any portions of Cook Inlet. The Corps determined that the action area for the project only encompasses a small area covering the project footprint, a 300-foot buffer, and three miles down the Johnson River. The Corps cannot use an unlawfully restrictive action area to avoid its obligation to consult under the ESA. *See* 50 C.F.R. § 402.02. The "action area" of a project includes all areas that will "be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." *Id*.

83.     The Corps' failure to complete section 7 consultation prior to issuing the permit constitutes a procedural violation of the ESA. 16 U.S.C. § 1536. The Corps failure to consult also constitutes a substantive violation of the ESA. *Id*. § 1536(a)(2). The agency has not fulfilled the ESA's mandate to ensure that its action does not jeopardize

the continued existence of the Cook Inlet beluga whale or adversely modify or destroy its critical habitat. *Id*.

## Second Claim for Relief
## (National Environmental Policy Act)

84.     Plaintiffs incorporate and adopt by reference each of the allegations in paragraphs 1 to 77.

85.     "NEPA's purpose is twofold: (1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1072 (9th Cir. 2011) (citations omitted). NEPA imposes procedural requirements directing agencies to take a "hard look" at environmental consequences, including direct, indirect, and cumulative impacts to all potentially affected resources. *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002); *see also* 42 U.S.C. § 4332(2)(C). The agency's analysis must consider and incorporate accurate scientific analysis. 42 U.S.C. § 4332(2)(D), (E). NEPA documents must contain more than conclusory statements, and the Corps cannot just defer to an applicant's conclusions. NEPA requires agencies to carry out a "careful and informed decisionmaking process," analyzing the potential environmental effects of a proposed action to aid the agency's own decisionmaking process and inform the public of any environmental consequences. *Calvert Cliffs' Coordination Comm., Inc. v. U.S. Atomic Energy Comm'n.*, 449 F.2d 1109, 1114–15 (D.C. Cir. 1971).

86.     NEPA requires the Corps to take a hard look at the potential for acid mine drainage and contaminant leaching from the Johnson Tract advanced mineral exploration project. Among other analysis, the Corps failed to adequately review and analyze:

a.  the number and location of material sites the applicant will disturb;

b.  the applicant's plans to blast and crush bedrock from at least one material site;

c.  the project components the applicant plans to construct using the rock excavated from the portal;

d.  where the excavated rock will be placed;

e.  the location and plans for the waste rock disposal site;

f.  the applicant's pHase Geochemistry (2023) report;

g.  whether the Alaska Department of Environmental Conservation has reviewed the pHase Geochemistry (2023) report;

h.  the number and location of samples the applicant used for its acid base accounting testing;

i.  the applicant's acid base accounting test results for "sample 5," identified as a "possible outlier;"

j.  the cautionary statements contained in the 2003 USGS study; and

k.  the 2022 HighGold report showing the presence of acid-generating sulfide minerals in the Johnson Deposit.

The Corps must disclose all of this information and analysis to the public.

87. Mine seepage from the portal is a reasonably foreseeable effect of the proposed action. The Corps failed to take a hard look at the potential for seepage from the exploration portal, as well as the effects if seepage were to occur. Once the mine seepage has exited the portal, it may continue to flow downhill and contaminate nearby streams, wetlands, and the Johnson River. The Corps must also consider reasonable alternatives that would reduce the potential for such seepage into streams, wetlands, and the Johnson River, including an exploration portal with an upward slope, which would contain the seepage within the exploration tunnel.

88. The Corps also failed to take the required hard look at the project's impacts to Cook Inlet beluga whales, including noise pollution, prey depletion, and other harms.

89. The Corps failed to satisfy NEPA's requirement to take a hard look at the reasonably foreseeable effects of the project. The Corps' conclusions lack support, reasoning, or analysis. The Corps' Memorandum for Record and decision to grant the permit is arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA, in violation of the APA. *See* 5 U.S.C. § 706(2).

## Third Claim for Relief
### (Clean Water Act)

90. Plaintiffs incorporate and adopt by reference each of the allegations in paragraphs 1 through 77.

91. The Corps must comply with the 404(b)(1) Guidelines when issuing CWA section 404 permits for the discharge of dredge or fill material into waters of the United

States. 33 U.S.C. § 1344(b); 40 C.F.R. pt. 230. The 404(b)(1) Guidelines require the Corps to make factual determinations of the effects of the proposed discharge on the aquatic environment. 40 C.F.R. § 230.11. This includes an evaluation of the secondary effects "that are associated with a discharge, . . . but do not result from the actual placement of the dredged or fill material." *Id.* § 230.11(h).

92.     The Corps has failed to adequately consider the direct, indirect, secondary, and cumulative impacts of the project on the aquatic environment, including:

    a.  the number and location of material sites the applicant will disturb;

    b.  the applicant's plans to blast and crush bedrock from at least one material site;

    c.  the project components the applicant plans to construct using the rock excavated from the portal;

    d.  where the excavated rock will be placed;

    e.  the location and plans for the waste rock disposal site;

    f.  the applicant's pHase Geochemistry (2023) report;

    g.  whether the Alaska Department of Environmental Conservation has reviewed the pHase Geochemistry (2023) report;

    h.  the number and location of samples the applicant used for its acid base accounting testing;

    i.  the applicant's acid base accounting test results for "sample 5," identified by the applicant as a "possibly outlier;"

j.   the cautionary statements contained in the 2003 USGS study;

k.   the 2022 HighGold report showing the presence of acid-generating sulfide minerals in the Johnson Deposit; and

l.   potential seepage from the Johnson Deposit exploration portal, including seepage that may continue downhill and contaminate nearby waters of the United States.

93.   The Corps' Memorandum for Record and decision to grant the permit is arbitrary, capricious, an abuse of discretion, and not in accordance with the CWA, in violation of the APA. 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court:

1.   Enter a declaratory judgment that Defendants' issuance of the permit violates the procedural and substantive provisions of section 7 of the ESA;

2.   Enter a declaratory judgment that Defendants' approval of the permit and underlying analysis were arbitrary, capricious, and not in accordance with the CWA or NEPA;

3.   Vacate the Memorandum for Record;

4.   Vacate the permit;

5.   Enter appropriate injunctive relief to prevent irreparable harm to Plaintiffs and to the environment until such compliance occurs;

6.     Award Plaintiffs the costs of this action, including reasonable attorneys'

fees, pursuant to the ESA, 16 U.S.C. § 1540(g) and the Equal Access to Justice Act, 28

U.S.C. § 2412; and

7.     Grant such other relief as this Court deems just and proper.


Respectfully submitted this 20th day of May, 2025.

*/s/Marlee Goska*
Marlee Goska (Alaska Bar No. 2305043)
Center for Biological Diversity
P.O. Box 1178
Homer, AK 99603
(907) 931-4775
mgoska@biologicaldiversity.org

*/s/Kristen Monsell*
Kristen Monsell (California Bar No. 304793)
(*pro hac vice application forthcoming*)
Center for Biological Diversity
2100 Franklin St., Suite 375
Oakland, CA 94612
(510) 844-7100
kmonsell@biologicaldiversity.org

*/s/Roger Flynn*
Roger Flynn (Colorado Bar No. 21078)
(*pro hac vice application forthcoming*)
Western Mining Action Project
P.O. Box 349
440 Main St., #2
Lyons, CO 80540
(303) 823-5738
wmap@igc.org

*Attorneys for Plaintiffs*