Marlee Goska (Alaska Bar No. 2305043)
Rebecca Noblin (Alaska Bar No. 0611080)
Center for Biological Diversity
P.O. Box 1178
Homer, AK 99603
(907) 931-4775
(907) 350-4822
mgoska@biologicaldiversity.org
rnoblin@biologicaldiversity.org

Kristen Monsell (*pro hac vice*)
Center for Biological Diversity
2100 Franklin St., Suite 375
Oakland, CA 94612
(510) 844-7100
kmonsell@biologicaldiversity.org

Roger Flynn (*pro hac vice*)
Western Mining Action Project
P.O. Box 349
440 Main St., #2
Lyons, CO 80540
(303) 823-5738
roger@wmaplaw.org

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| COOK INLETKEEPER, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. ARMY CORPS OF ENGINEERS, et al.,<br><br>*Federal Defendants*,<br><br>and<br><br>J T MINING, INC.,<br><br>*Intervenor-Defendant*. | Case No. 3:25-cv-00097-SLG |

## PLAINTIFFS' REPLY BRIEF

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................iii

INTRODUCTION ............................................................................................... 1

ARGUMENT....................................................................................................... 1

    I.      The Corps' failure to consult violates the ESA. ............................. 1

          A.      Plaintiffs have standing for this claim...............................2

                1.      Plaintiffs have demonstrated an injury-in-fact. .......................2

                2.      Plaintiffs satisfy causation and redressability. ........................5

          B.      The Corps violated the ESA...............................................7

    II.     The Corps' permitting decision violates NEPA. ......................... 12

          A.      The Corps failed to take a hard look at the potential for acid mine drainage. .................................................................... 13

                 1.      The Corps ignored sampling inconsistencies, including JT Mining's omission of a potentially acid-generating sample. 14

                2.      The Corps ignored evidence in the HighGold 2022 report that the Johnson Tract Deposit contains acid-generating sulfides. ......................................................................... 17

          B.      The Corps failed to take a hard look at JT Mining's plans for portal-excavated rock, potential portal seepage, and blasting material sites. ......................................................................... 18

    III.    The Corps' permitting decision violates the CWA......................21

          A.      The Corps had a duty to ensure that its information was adequate and accurate...................................................................21

          B.      The Corps did not resolve inconsistencies in the record regarding jurisdictional waters in the material sites. .........................22

          C.      The Corps did not resolve conflicts in the record regarding the potential for acid rock drainage and heavy metal contamination. ...23

    IV.    Remedy................................................................................25

CONCLUSION ................................................................................................25

**TABLE OF AUTHORITIES**

**Cases**

*Audubon Soc'y of Portland v. Army Corps of Eng'rs*,
No. 3:15-cv-665-SI, 2016 WL 4577009 (D. Or. Aug. 31, 2016) ................................. 25

*Audubon Soc'y of Portland v. Haaland,*
40 F.4th 967 (9th Cir. 2022) ............................................................................... 16

*Barnes v. DOT*,
655 F.3d 1124 (9th Cir. 2011) ............................................................................ 14

*Cascadia Wildlands v. BLM*,
153 F.4th 869 (9th Cir. 2025) ............................................................................. 16

*CBD v. Bernhardt*,
982 F.3d 723 (9th Cir. 2020) ................................................................................ 5

*CBD v. BLM*,
141 F.4th 976 (9th Cir. 2025) ........................................................................... 3, 8

*CBD v. Forest Serv.*,
No. CV 22-91-M-DLC, 2025 WL 3268655 (D. Mont. Nov. 24, 2025) ........................ 14

*CBD v. HUD*,
541 F. Supp. 2d 1091 (D. Ariz. 2008) .................................................................. 11

*Chilkat Indian Vill. of Klukwan v. BLM*,
825 F. App'x 425 (9th Cir. 2020) ......................................................................... 4

*Clapper v. Amnesty Int'l*,
568 U.S. 398 (2013) ........................................................................................... 3

*Cottonwood Env't Law Ctr. v. Forest Serv.*,
789 F.3d 1075 (9th Cir. 2015) .............................................................................. 4

*DOT v. Public Citizen*,
541 U.S. 752 (2004) ........................................................................................... 6

*Earth Island Inst. v. Forest Serv.*,
351 F.3d 1291 (9th Cir. 2003) ............................................................................ 18

*Env't Def. v. Army Corps of Eng'rs*,
515 F. Supp. 2d 69 (D.D.C. 2007) ....................................................................... 24

*Cook Inletkeeper et al. v. U.S. Army Corps et al.*                                         iii
No. 3:25-cv-00097-SLG

*Env't Prot. Info. Ctr. v. Van Atta*,
  692 F. Supp. 3d 879 (N.D. Cal. 2023) ................................................................................9

*Friends of the Earth v. Laidlaw Env't Servs.*,
  528 U.S. 167 (2000) ........................................................................................................2

*Friends of the Wild Swan v. Weber*,
  767 F.3d 936 (9th Cir. 2014) ..........................................................................................9

*Friends of Yosemite Valley v. Norton*,
  348 F.3d 789 (9th Cir. 2003) ........................................................................................24

*Great Basin Res. Watch v. BLM*,
  844 F.3d 1095 (9th Cir. 2016) ..............................................................................19, 20

*Growth Energy v. EPA*,
  5 F.4th 1 (D.C. Cir. 2021) ..............................................................................................10

*Idaho Farm Bureau Fed'n v. Babbitt*,
  58 F.3d 1392 (9th Cir. 1995) ........................................................................................25

*Karuk Tribe of Cal. v. Forest Serv.*,
  681 F.3d 1006 (9th Cir. 2012) ................................................................................10, 12

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ........................................................................................................2

*Metcalf v. Daley*,
  214 F.3d 1135 (9th Cir. 2000) ......................................................................................13

*Nat'l Family Farm Coal. v. EPA*,
  966 F.3d 893 (9th Cir. 2020) ..........................................................................................9

*Nat'l Wildlife Fed'n v. Coleman*,
  529 F.2d 359 (5th Cir. 1976) ........................................................................................10

*Native Ecosystems Council v. Dombeck*,
  304 F.3d 886 (9th Cir. 2002) ..........................................................................................9

*NRDC v. Houston*,
  146 F.3d 1118 (9th Cir. 1998) ........................................................................................7

*NRDC v. Jewell*,
  749 F.3d 776 (9th Cir. 2014) ...............................................................................2, 5, 11

*Cook Inletkeeper et al. v. U.S. Army Corps et al.*                               iv
No. 3:25-cv-00097-SLG

*Or. Nat. Desert Ass'n v. BLM*,
625 F.3d 1092 (9th Cir. 2010)..................................................................16, 17, 18, 21

*Or. Wild v. Forest Serv.*,
No. 1:22-cv-01007-MC, 2026 WL 96908 (D. Or. Jan. 13, 2026) ................................12

*Or.-Cal. Trails Ass'n v. Walsh*,
467 F. Supp. 3d 1007 (D. Colo. 2020)........................................................................8

*Salmon Spawning & Recovery All. v. Gutierrez*,
545 F.3d 1220 (9th Cir. 2008)...................................................................................6

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
747 F.3d 581 (9th Cir. 2014).....................................................................................16

*San Luis & Delta-Mendota Water Auth. v. Locke*,
776 F.3d 971 (9th Cir. 2014).....................................................................................10

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*,
605 U.S. 168 (2025) .................................................................................12, 13, 19, 25

*Swanson v. Forest Serv.*,
87 F.3d 339 (9th Cir. 1996).......................................................................................16

*Tri-Valley CAREs v. Dept. of Energy*,
671 F.3d 1113 (9th Cir. 2012)....................................................................................16

*White Tanks Concerned Citizens, Inc. v. Strock*,
563 F.3d 1033 (9th Cir. 2009)....................................................................................19

*WildEarth Guardians v. Dep't of Agric.*,
795 F.3d 1148 (9th Cir. 2015)..................................................................................2, 6

*WildEarth Guardians v. Mont. Snowmobile Ass'n*,
790 F.3d 920 (9th Cir. 2015)......................................................................................19

**Statutes**

5 U.S.C. § 706(2)(A) ................................................................................................25

16 U.S.C. § 1855(b)(2) .............................................................................................11

42 U.S.C. § 4332(2)(D) .............................................................................................13

42 U.S.C. § 4332(2)(E).............................................................................................13

*Cook Inletkeeper et al. v. U.S. Army Corps et al.*                                                                    v
No. 3:25-cv-00097-SLG

42 U.S.C. § 4336e(5) ................................................................................................ 13

**Regulations**

33 C.F.R. § 320.4 ..................................................................................................... 24

33 C.F.R. § 320.4(a)(1) .............................................................................................. 5

33 C.F.R. § 320.4(c) ................................................................................................. 11

33 C.F.R. § 333.51(a)-(e) .......................................................................................... 14

33 C.F.R. pt. 325 App. B § 8(f)(2) ............................................................................ 14

40 C.F.R. § 230.1(d) ................................................................................................ 22

40 C.F.R. § 230.11 ................................................................................................... 21

40 C.F.R. § 230.11(d) .............................................................................................. 24

40 C.F.R. § 230.5(g) ................................................................................................ 21

50 C.F.R. § 402.02 ................................................................................................ 5, 8

50 C.F.R. § 402.14(a) ............................................................................................... 11

*Cook Inletkeeper et al. v. U.S. Army Corps et al.*                                              vi
No. 3:25-cv-00097-SLG
Case 3:25-cv-00097-SLG     Document 43     Filed 03/23/26     Page 6 of 32

**INTRODUCTION**

The U.S. Army Corps of Engineers (Corps) violated the Endangered Species Act (ESA), National Environmental Policy Act (NEPA), and Clean Water Act (CWA) when it issued a permit to JT Mining to build a road and airstrip to support exploration for gold on a private inholding surrounded by Lake Clark National Park. The record shows that JT Mining's activities have the potential to negatively affect endangered Cook Inlet beluga whales that rely on nearby Tuxedni Bay, produce harmful acid mine drainage, and have other negative impacts that the Corps did not assess or disclose to the public.

Rather than demonstrating that the Corps complied with the law, Federal Defendants and Intervenor offer arguments that are inconsistent with the law and the record and, at times, with each other. That the Defendants themselves cannot tell a coherent story about how the Corps met its obligations under the ESA, NEPA, and CWA speaks to the lack of support in the record for the Corps' decision. Plaintiffs therefore respectfully ask this Court to grant Plaintiffs' motion for summary judgment, vacate the permit, and remand the decision to the Corps.

**ARGUMENT**

**I.     The Corps' failure to consult violates the ESA.**

The Corps' failure to consult with the National Marine Fisheries Service (NMFS) regarding the potential effects of the project on endangered Cook Inlet beluga whales violates section 7 of the ESA. Pls.' Br. 17-28. Lacking a viable defense on the merits, Federal Defendants attack Plaintiffs' standing, largely by disclaiming any responsibility for the noise pollution the Corps previously acknowledged its permit will likely cause

*Cook Inletkeeper et al. v. U.S. Army Corps et al.*                                                    1
No. 3:25-cv-00097-SLG

and conflating distinct National Park Service (NPS) actions with the decision under review. That NPS consulted on the impacts of aircraft traffic on Cook Inlet belugas for that separate action only emphasizes the unlawfulness of the Corps' failure to do so here. Defendants do not demonstrate otherwise.

### A. Plaintiffs have standing for this claim.

Plaintiffs have standing for their ESA claim because they have suffered an injury-in-fact that is fairly traceable to the Corps' failure to consult on the effects of the project on Cook Inlet beluga whales and is likely to be redressed by a favorable court decision. *See NRDC v. Jewell*, 749 F.3d 776, 782 (9th Cir. 2014); Pls.' Br. 16. The failure to comply with the ESA's "consultation requirement constitute[s] a procedural injury for standing purposes," *NRDC*, 749 F.3d at 783, for which "the causation and redressability requirements are relaxed," *WildEarth Guardians v. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015) (citation omitted).

#### 1. *Plaintiffs have demonstrated an injury-in-fact.*

Plaintiffs have demonstrated their members' concrete aesthetic, professional, and cultural interests in the whales; their intention to use and enjoy and continue to honor these endangered animals in the future; and their "reasonable concerns" about how the project will harm those interests. *Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167, 183-84 (2000); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562-63 (1992) (holding these types of interests are "undeniably [] cognizable interest[s] for purpose of standing"); Pls.' Br. 16 (citing declarations).

Federal Defendants wrongly characterize Plaintiffs' injuries as "speculative" because the agency only permitted the discharge of fill, not "increased aircraft traffic." Feds.' Br. 17. But the Corps identified increased noise from aircraft as an indirect effect of its permit and cannot now claim such effects will not occur. *See* AR000158; *see also* AR00962 (JT Mining acknowledging that "[p]otential noise sources from the Proposed Action include . . . aircraft noise."). The Corps reached this determination because a primary purpose of the project is to increase the size of an existing runway to accommodate the larger aircraft JT Mining will use during exploration activities under the Corps permit. *See, e.g.*, AR000125 (Corps stating that "[t]he overall project purpose is to construct an airstrip"); AR000158 (Corps noting that "expansion of the airstrip would allow for larger aircraft to land in the area"); AR000949 (JT Mining stating that it "is proposing to realign and lengthen the existing airstrip to accommodate heavy aircraft").[1]

None of Federal Defendants' cases show injury-in-fact is lacking. *Clapper v. Amnesty International* did not involve a procedural injury, and the plaintiffs' harm depended on a "highly attenuated chain" of several uncertain future events. 568 U.S. 398, 410 (2013). Here, the challenged action will enable heavy aircraft to fly to the project site, which will injure Plaintiffs. *Chilkat Indian Village of Klukwan v. BLM*—in which standing was not at issue—did not involve any "specific proposal" for the agency to

---

[1] Even if the aircraft traffic was contingent on future phases (which it is not), that would not defeat injury, because "in a procedural-injury case," such as this, "the standard for proving imminence is lower." *CBD v. BLM*, 141 F.4th 976, 1008 (9th Cir. 2025).

*Cook Inletkeeper et al. v. U.S. Army Corps et al.* 3
No. 3:25-cv-00097-SLG

evaluate. 825 F. App'x 425, 427 (9th Cir. 2020). Here the Corps already issued a permit for specific activities that will enable heavy aircraft to land on the airstrip.

True, the Corps did not find that the project would increase noise in Tuxedni Bay. Feds.' Br. 18. But that is because the Corps did not consider *any* effects outside its artificially constrained action area. It "is the objective and purpose of the consultation process" to answer the question of how the project will increase noise pollution in Tuxedni Bay, and how that noise might affect belugas. *Cottonwood Env't Law Ctr. v. Forest Serv.*, 789 F.3d 1075, 1082 (9th Cir. 2015). And contrary to Federal Defendants' suggestion, Feds.' Br. 18, the record indicates that project-related aircraft would likely fly over Tuxedni Bay, *see* Pls.' Br. 22-23 (citing record evidence describing flights between the existing airstrip and Anchorage, including a map showing the most direct route passing over Tuxedni Bay). Indeed, Federal Defendants seem to admit that aircraft access to the project area would likely involve transit over Tuxedni Bay when they incorrectly assert that flights resulting from the Corps permit are subject to the NPS easement mitigation measures for Tuxedni Bay. *See* Feds.' Br. 19-20; Dkt. 40-7 at 8 (map of easements); *see also infra* p. 6-7 (explaining NPS easements and mitigation measures cover different activities from the Corps permit).

Federal Defendants also wrongly claim that injury is lacking because the permitted construction activities will supposedly only occur between May 1 and October 15, and Tuxedni Bay is a winter foraging ground for the whales. Feds.' Br. 18 (citing JT Mining's description of the "Start-Up/Shut Down" dates at AR001502). But nothing in the permit restricts activity to this window. AR000008-09 (listing conditions); *see CBD v.*

*Cook Inletkeeper et al. v. U.S. Army Corps et al.*       4
No. 3:25-cv-00097-SLG

*Bernhardt*, 982 F.3d 723, 744 (9th Cir. 2020) (agency cannot rely on measures that are not sufficiently "integrated into the proposed action"). Even if it did, record evidence shows the whales are especially reliant on Tuxedni Bay in September and October when JT Mining will be operating. *See, e.g.*, AR002447 (reporting that in Tuxedni Bay and River "[f]eeding behavior was detected multiple times, with maximum occurrence in September and October").

### 2. *Plaintiffs satisfy causation and redressability.*

Plaintiffs also satisfy causation and redressability. To satisfy these prongs, a plaintiff "need only demonstrate that compliance with Section 7(a)(2) *could* protect its concrete interests." *NRDC*, 749 F.3d at 783. That standard is met. Engaging in ESA consultation could influence the Corps' decision of whether to issue the permit or implement measures to protect belugas. *See id.*; *see also* 33 C.F.R. § 320.4(a)(1) (stating Corps must evaluate all "probable impacts . . . of the proposed activity" in deciding "whether to issue a permit," including effects to wildlife); Pls.' Br. 24 (listing examples of measures to protect belugas from aircraft required under other projects).

Federal Defendants mistakenly claim that the Corps cannot be the cause of Plaintiffs' injuries because aircraft traffic over Tuxedni Bay "is regulated by separate federal authorizations." Feds.' Br. 19. But without the Corps permit, heavy aircraft could not land on the runway. AR000949. The permit is therefore a but-for cause of the noise pollution at issue. *See* 50 C.F.R. § 402.02 (ESA regulations defining "[e]ffects of the action"). The Corps acknowledged as much in stating that "expansion of the airstrip would allow for larger aircraft to land in the area" when identifying "indirect effects

*Cook Inletkeeper et al. v. U.S. Army Corps et al.*      5
No. 3:25-cv-00097-SLG

which are caused by the proposed activity" in its Decision Memorandum. AR000158. Because the Corps "is at least partially causing the alleged injury, [Plaintiffs] may sue th[is] defendant." *WildEarth Guardians*, 795 F.3d at 1157.

*Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220 (9th Cir. 2008), and *DOT v. Public Citizen*, 541 U.S. 752 (2004), on which Federal Defendants rely, only show why causation and redressability are present here. Unlike the international treaty and Presidential decisions at issue in those cases, here the Corps has broad latitude in deciding whether to issue the permit; and this Court can redress Plaintiffs' injuries stemming from that permit by vacating it.

Federal Defendants assert that the NPS consultation for a separate action regarding the issuance of easements, Dkt. 40-7 at 3, excuses the Corps' failure to consult on its action. Fed. Br. 19-20. The NPS easements involve entirely different activities, as they are for the planning phase of the development of "a road/rail line and port" across NPS lands, connecting Tuxedni Bay to the Johnson Tract. Dkt. 40-2 at 5; *see also* Dkt. 40-4 at 4-5, 17 (noting the port easement is for the planning phase "of a port" in Tuxedni Bay); Dkt. 40-5 at 4-5, 18 (noting the transportation easement is for the planning phase "of a road or rail line" to the east of Johnson Tract).[2]

---

[2] Federal Defendants also point to a right-of-way NPS issued to HighGold (JT Mining's parent company). Feds.' Br. 19 (citing AR001620-26). But that right-of-way is for helicopter landings in the north tract of Johnson Tract, where NPS manages the surface estate, AR001617, whereas the Corps permit is for activities on the south tract, *see* AR000994, which is private, fee simple land, AR001617; AR000160.

*Cook Inletkeeper et al. v. U.S. Army Corps et al.*　　　　　　　　　　6
No. 3:25-cv-00097-SLG
Case 3:25-cv-00097-SLG　　　Document 43　　　Filed 03/23/26　　　Page 12 of 32

The mitigation measures under the NPS easements are for aircraft associated with developing the road/rail line and port, not the Corps-permitted exploration activities, including the expanded airstrip. *See* Dkt. 40-5 at 24 (noting the aircraft mitigation measures under NPS easements "apply to Planning Phase activities"); Dkt. 40-7 at 5 (describing planning phase activities). Contrary to Federal Defendants' repeated assertions, the Corps did not adopt these measures for the aircraft traffic under its permit, *see* Dkt. 40-1 ¶ 2 (admitting the NPS easements documents are not in the administrative record), and it cannot now rely on them to assert that effects to belugas will not occur, or that the Corps' permit is not a cause of Plaintiffs' injuries, *see NRDC v. Houston*, 146 F.3d 1118, 1129 (9th Cir. 1998) ("The failure to respect the process mandated by [the ESA] cannot be corrected with post-hoc assessments of a done deal.").

**B.      The Corps violated the ESA.**

Defendants' responses to Plaintiffs' ESA claims on the merits also fail. Federal Defendants' extensive reliance on what a different agency did in a different action, covering different activities, only highlights the Corps' errors. NPS's decision to consult with NMFS led to the adoption of mitigation measures that are "important to protect the critically endangered Cook Inlet beluga whale population, which congregate in Tuxedni Bay and Tuxedni Channel during the winter months as the area provides uniquely quiet waters which are largely free of anthropogenic disturbance." Dkt. 40-2 at 11. But because the Corps failed to consult on its action, belugas are left without these protections from aircraft noise under the Corps permit.

*Cook Inletkeeper et al. v. U.S. Army Corps et al.*                                        7
No. 3:25-cv-00097-SLG
Case 3:25-cv-00097-SLG      Document 43      Filed 03/23/26      Page 13 of 32

The Corps did not conduct a "rigorous[] analy[sis]," Feds.' Br. 21, into whether its action might affect Cook Inlet belugas. Instead, the Corps acknowledged that increased air traffic and noise is a reasonably foreseeable effect of the permit, AR000158, but then ignored the effects of that noise on belugas. And it did so despite the proximity of Tuxedni Bay to the project area, evidence that these whales are negatively affected by aircraft noise, and new science regarding the vital importance of Tuxedni Bay to belugas. *See* Pls.' Br. 11-12, 20-24.[3]

Indeed, the Corps' only references to Cook Inlet belugas are conclusory statements that "the action area for this proposed project does not extend into Tuxedni Bay or the Cook Inlet, which is where beluga whales and their critical habitat . . . are located." AR000135; *see also* AR000129 (similar). But the ESA requires an agency to identify "all areas to be affected directly or indirectly by the Federal action," 50 C.F.R. § 402.02, and then evaluate all the possible effects within that area—not discount indirect effects because they are not within the immediate "action" area.

In other words, indirect effects "are not *constrained* by the action area—they *are* the action area." *Or.-Cal. Trails Ass'n v. Walsh*, 467 F. Supp. 3d 1007, 1050 (D. Colo. 2020); *see also Env't Prot. Info. Ctr. v. Van Atta*, 692 F. Supp. 3d 879, 896-97 (N.D.

---

[3] This evidence belies Intervenor's assertion that considering the effects of such noise would be conjecture. Intrvr.'s Br. 17. Moreover, the Corps did not conclude that evaluating such effects would be speculative. Rather, the agency ignored such effects entirely because they were outside of the agency's unlawfully restricted action area. *Cf. CBD v. BLM*, 141 F.4th at 1013-14 (deferring to an action agency's "detailed explanation for why it did not view [a] project-specific [impact] as 'effects of the action,'" when the agency "supported that conclusion with studies").

*Cook Inletkeeper et al. v. U.S. Army Corps et al.*                                   8
No. 3:25-cv-00097-SLG

Case 3:25-cv-00097-SLG   Document 43   Filed 03/23/26   Page 14 of 32

Cal. 2023) (holding an action area unlawful where it excluded waters twenty miles downstream of a dam). Intervenor's argument that this means the action area would extend to Anchorage is inconsistent with the NPS consultation. There, NMFS determined the action area "extends out to a point where no measurable effects from the project are expected to occur" and included "vessel and aircraft traffic transiting on, in, or over Tuxedni Bay and Tuxedni Channel." Dkt. 40-7 at 8.

*Friends of the Wild Swan v. Weber* is inapposite. 767 F.3d 936 (9th Cir. 2014). There, the court upheld the agency's delineation of the action area over the plaintiff's objection that it did not include enough of the species' habitat because the agency "did include what it considered to be the relevant portions." *Id.* at 950. Here, the Corps did not consider *any* effects within any area of Cook Inlet beluga habitat. *National Family Farm Coalition v. EPA* is also distinguishable. 966 F.3d 893 (9th Cir. 2020). There, the action included mitigation measures to prevent effects outside of the defined action area, *id.* at 927, where here there are none. *Native Ecosystems Council v. Dombeck*, on which Defendants rely, supports Plaintiffs' argument. 304 F.3d 886 (9th Cir. 2002). In that case, the Ninth Circuit held that the agency unlawfully defined the action area to exclude lands where the underlying project may have indirectly affected ESA-listed grizzly bears. *Id.* at 900-02. The Corps took a similarly arbitrary approach here.

Federal Defendants claim that "the portal access road would reduce the need for aircraft traffic at the site" and thereby "reduce helicopter noise." Feds.' Br. 22. But the quoted language refers to aircraft traffic between the camp and drill site, which would not affect belugas in Tuxedni Bay. Even if the road did reduce aircraft traffic over Tuxedni

*Cook Inletkeeper et al. v. U.S. Army Corps et al.*                                                                 9
No. 3:25-cv-00097-SLG

Bay, that would not excuse the Corps' failure regarding the heavy aircraft needing the runway. "*Any possible effect,* whether beneficial, benign, adverse or of an undetermined character, triggers the [consultation] requirement." *Karuk Tribe of Cal. v. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012) (citation modified).

Equally unavailing is Federal Defendants' claim that the Corps did not have to evaluate the effects of aircraft noise because it supposedly has no ability to regulate its effects. Feds.' Br. 19. This argument contradicts the agency's own decisionmaking, given it identified the effects of aircraft noise as an indirect effect of its action that it then purported to evaluate in its Decision Memorandum, albeit limited to the immediate project site. AR000158. Moreover, this argument reads non-existent restrictions into the consultation obligation. The Corps must consult if its action has "any chance of affecting [Cook Inlet belugas]—even if it is later determined that the action[] [is] 'not likely' to do so." *Karuk Tribe*, 681 F.3d at 1027 (citation omitted). This includes an evaluation of indirect effects, which are ones "that the action makes possible (or indeed, more probable), but does not directly cause." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 1009 (9th Cir. 2014). This duty applies even if some actions are regulated by a third party. *See Nat'l Wildlife Fed'n v. Coleman*, 529 F.2d 359, 373 (5th Cir. 1976) (foundational early ESA case holding unlawful an agency's failure to consider the indirect effects to the sandhill crane of "residential and commercial development that [could] be expected to result from the construction of [a] highway."); *Growth Energy v. EPA*, 5 F.4th 1, 31 (D.C. Cir. 2021) (holding unlawful EPA's failure to consult where the evidence showed a "relationship between [its] renewable fuel standards program, biofuel

*Cook Inletkeeper et al. v. U.S. Army Corps et al.*                                                                10
No. 3:25-cv-00097-SLG

feedstock production, and land use changes that may harm listed species or critical habitat").

And contrary to Federal Defendants' suggestion, NPS was required to engage in ESA consultation and consider all the possible effects of its action not "because [it] regulates aircraft," Feds.' Br. 19, but because it engaged in an action—issuance of the easements—that might affect ESA-listed species. It is the Corps' failure to engage in this process for its own action that Plaintiffs challenge here. *See NRDC*, 749 F.3d at 784 ("Whether an agency must consult does not turn on the *degree* of discretion that the agency exercises regarding the action in question, but on whether the agency has any discretion to act in a manner beneficial to a protected species or its habitat.").

Federal Defendants' reliance on *CBD v. HUD* is misplaced. 541 F. Supp. 2d 1091 (D. Ariz. 2008). There, the agency had no "discretion to consider environmental factors." *Id.* at 1100. Here, in contrast, the Corps has broad discretion, and indeed the duty, to consider the indirect environmental effects of its permit. Under its regulations, it must consult with NMFS "with a view to the conservation of wildlife resources by prevention of their direct and indirect loss due to the activity" and to "give full consideration to [NMFS's] views . . . in deciding on the issuance, denial, or conditioning of . . . permits." 33 C.F.R. § 320.4(c).[4]

---

[4] Federal Defendants also cite a comment letter from NMFS, claiming the fact it did not mention concerns about belugas somehow validates the Corps' failure to consult. Feds.' Br. 24. But that was about effects to "Essential Fish Habitat"—an evaluation required under the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. § 1855(b)(2), not the ESA, AR001426-28. Moreover, the duty to make an initial "may affect" determination lies with the action agency, not NMFS. 50 C.F.R. § 402.14(a).

*Cook Inletkeeper et al. v. U.S. Army Corps et al.* 11
No. 3:25-cv-00097-SLG
Case 3:25-cv-00097-SLG   Document 43   Filed 03/23/26   Page 17 of 32

The evidence shows aircraft traffic under the project "may affect" belugas. Pls.' Br. 19-26. *Contra* Feds.' Br. 23-24; Intrvr.'s Br. 18-21. A new study from NMFS scientists concludes that keeping Tuxedni Bay free of human-caused noise pollution is key to the survival of the species, and other evidence demonstrates that noise pollution, including from aircraft, harms belugas. Pls.' Br. 23-24. That the Corps determined aircraft noise in other areas would be "negligible," Feds.' Br. 22; Intrvr.'s Br. 19-20, is irrelevant. Regardless, "benign" effects satisfy the "may affect" standard. *Karuk Tribe*, 681 F.3d at 1027.

## II. The Corps' permitting decision violates NEPA.

The Corps failed to take a hard look at the potential for acid mine drainage and metals leaching from the project and improperly deferred to JT Mining's claims that acid mine drainage would not occur from the project. Specifically, the Corps ignored inconsistences in the record regarding: (1) sampling, including a potentially acid-generating "outlier" sample that JT Mining omitted; and (2) the presence of acid-generating sulfides in the Johnson Tract Deposit. *See* Pls.' Br. 28-36.

*Seven County Infrastructure Coalition v. Eagle County, Colorado,* does not excuse the Corps' failure. 605 U.S. 168 (2025). There, the Court affirmed that the Administrative Procedure Act's (APA) arbitrary and capricious standard applies in evaluating whether an agency's NEPA analysis is "reasonable and reasonably explained." *Id.* at 179-80; *see also Or. Wild v. Forest Serv.*, No. 1:22-cv-01007-MC, 2026 WL 96908, at *10 (D. Or. Jan. 13, 2026) ("*Seven County* does not grant an agency discretion to forgo NEPA requirements, nor does it displace arbitrary and capricious review."). Courts should conduct this review

*Cook Inletkeeper et al. v. U.S. Army Corps et al.*                    12
No. 3:25-cv-00097-SLG

against the backdrop of NEPA's purpose of "ensur[ing] that the agency and the public are aware of the environmental consequences of proposed projects." *Seven Cnty.*, 605 U.S. at 177. This is especially important when reviewing an environmental assessment (EA), as it provides the agency's sole basis for foregoing an environmental impact statement (EIS). *See Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000).

### A. The Corps failed to take a hard look at the potential for acid mine drainage.

The Corps failed to take a hard look at the impacts of acid mine drainage and metals leaching from the project, and instead improperly relied on JT Mining's assertions. Pls.' Br. 30-36. Acid mine drainage results when rock containing sulfides is disturbed and exposed to air and water, creating sulfuric acid in a process that is difficult to stop or reverse once it has started. *See id.* at 31. Acid mine drainage can damage entire watersheds and harm fish and other aquatic life even at low levels. *Id*.

Defendants cannot evade the Corps' responsibility to verify applicant information and ensure its scientific integrity. *Contra* Feds.' Br. 28-32; Intrvr.'s Br. 26-28. NEPA requires the Corps to independently verify the information on which it relies in an EA, mandating that "agencies . . . shall . . . ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document," and "make use of reliable data and resources." 42 U.S.C. § 4332(2)(D), (E); *accord id.* § 4336e(5) (defining "environmental document"). Thus, the Corps has an affirmative duty

to ensure that the information it relies on is accurate and reliable.[5] *See Barnes v. DOT*, 655 F.3d 1124, 1131 (9th Cir. 2011) (explaining that agencies are "required to independently evaluate the information in [an] EA and [are] responsible for its accuracy"); *CBD v. Forest Serv.*, No. CV 22-91-M-DLC, 2025 WL 3268655, at *11 (D. Mont. Nov. 24, 2025) (holding that an EA that "relied on incorrect assumptions" and did not "provide accurate data to the public" did not meet NEPA's hard look requirement (citation modified)).

### 1. The Corps ignored sampling inconsistencies, including JT Mining's omission of a potentially acid-generating sample.

The Corps concluded that "sampling has been conducted for material sites and all samples were classified as non-acid generating." AR000147. But record evidence does not clearly show which, if any, of the material sites were actually sampled, and JT Mining stated that "[a]nalysis of the material sites is not available." AR000967; Pls.' Br. 32-33.

Defendants cite many conclusory statements in the record, *see* Feds.' Br. 29; Intrvr.'s Br. 26-28, but none show that the Corps asked for information about the location(s) where the samples were actually taken, reviewed the sample data, or otherwise met its responsibility under NEPA to verify applicant information and ensure

---

[5] Federal Defendants correctly point out that the regulations in place at the time of the challenged permitting decision only explicitly required the Corps to "independent[ly] evaluat[e]" information provided by an applicant when preparing an EIS. Feds.' Br. 28 (citing 33 C.F.R. pt. 325 App. B § 8(f)(2) (2024)). As explained above, NEPA itself requires the Corps to ensure the integrity of the information on which it relies, whether in an EA or an EIS. And the Corps revised its NEPA regulations in 2025 to explicitly require the agency to independently evaluate information provided by an applicant for an EA or an EIS. *See* 33 C.F.R. § 333.51(a)-(e); Pls.' Br. 30 n.2.

*Cook Inletkeeper et al. v. U.S. Army Corps et al.*                    14
No. 3:25-cv-00097-SLG
Case 3:25-cv-00097-SLG    Document 43    Filed 03/23/26    Page 20 of 32

its scientific integrity.[6] Federal Defendants also incorrectly state that "none of the material would be used to fill jurisdictional waters." Feds.' Br. 29 (citing AR000950). The Corps' Decision Memorandum says otherwise. *See, e.g.*, AR000140 (describing that fill placed in waters of the United States (i.e., WOTUS or jurisdictional waters) "would be sourced from material sites").

The Corps also failed to review the pHase Geochemistry (2023) report that JT Mining's Environmental Evaluation Document describes as a technical analysis of the acid mine drainage and metal leaching potential of the rock disturbed by the project and that contained results of the sampling on which JT Mining relied. Pls.' Br. 33-35. The Corps' failure is particularly concerning because JT Mining omitted one of the ten samples, Sample 5, from the data it provided to the Corps, *see* AR001850, labeling it an "outlier" among otherwise non-acid generating samples, AR000966; *see* Fed Defs.' Br. 30-31.

Put another way, ten percent of the rock that JT Mining sampled was a "possible exception" to its conclusion that the rock to be disturbed by the project was "non-acid generating." AR000966. Yet there is no evidence in the record that the Corps even knew about, let alone inquired into or considered, the missing "outlier" sample, JT Mining's resampling plans, or the existence of a full technical analysis of the sampling results (pHase Geochemistry (2023)). *See* AR000147-48. The Court "cannot defer to [this]

_____

[6] Intervenors argue that the Corps' review was "inherently reasonable" for considering the material sites at all, suggesting that this review was beyond the scope of what NEPA required the Corps to consider. Intrvr.'s Br. 22-23. But the material sites are properly within the scope of NEPA review, as explained *infra* p. 18-19.

*Cook Inletkeeper et al. v. U.S. Army Corps et al.*                                                                     15
No. 3:25-cv-00097-SLG
Case 3:25-cv-00097-SLG     Document 43     Filed 03/23/26     Page 21 of 32

void." *Or. Nat. Desert Ass'n v. BLM*, 625 F.3d 1092, 1121 (9th Cir. 2010). *Contra* Feds.' Br. 31; Intrvr.'s Br. 23, 28.

The cases Intervenor cites are easily distinguishable. *San Luis & Delta-Mendota Water Authority v. Jewell* does not apply here because there is no issue of information being "not readily available." 747 F.3d 581, 602 (9th Cir. 2014). The Corps simply failed to request the pHase Geochemistry (2023) report, information about outlier Sample 5, and any resampling results from JT Mining. *Tri-Valley CAREs v. Department of Energy* is also inapposite. 671 F.3d 1113 (9th Cir. 2012). The court rejected a NEPA claim regarding an agency's failure to fully disclose an "anthrax shipping incident" risk of "less than .11 per million shipments." *Id*. at 1128. Here, even the Corps recognized that acid mine drainage is "a common concern with . . . mineral exploration . . . projects." AR000162. And the record before the Corps shows that *ten percent* of the rocks that JT Mining sampled were potentially acid-generating. *See* AR001850; AR000966.[7] And unlike the impact at issue in *Cascadia Wildlands v. BLM*, here there is no scientific debate about the dangers of acid mine drainage. 153 F.4th 869, 903 (9th Cir. 2025).

Defendants also cite a 2003 United States Geological Survey (USGS) study of the geochemistry of the Johnson River, but that document does not support the Corps'

---

[7] Nor are the Corp's omissions "fly-speck[s]," Intrvr.'s Br. 25 (citation omitted). *Contra Audubon Soc'y of Portland v. Haaland,* 40 F.4th 967, 984-88 (9th Cir. 2022) (finding adequate a muti-thousand page EIS that provided "extensive" information and details about every approved pesticide); *Swanson v. Forest Serv.*, 87 F.3d 339, 343-44 (9th Cir. 1996) (same, where agency had prepared two "fairly exhaustive" EISs, and the inaccuracies raised by plaintiffs either had little support or were "inconsequential, technical deficiencies.").

*Cook Inletkeeper et al. v. U.S. Army Corps et al.*                                    16
No. 3:25-cv-00097-SLG
Case 3:25-cv-00097-SLG     Document 43     Filed 03/23/26     Page 22 of 32

summary conclusions. USGS conducted the study due to concerns that "[i]f ore and waste rock were kept near the mine site or near the Johnson River flood-plain, the material could potentially increase the metal load and acidity of water in the Johnson River, resulting in acid mine drainage." AR000635-36. Federal Defendants' selective quotes of the study omit qualifications and findings that point to the potential for acid mine drainage. For example, the study states that its sampling "results should be used with caution because similar tests were not done on rocks from narrow veins or faults that could have acid generating potential." AR000633. It further states that some pyrite samples from the Johnson River area were "high in sulfur," a finding that "supports the likelihood that unoxidized Talkeetna Formation rocks in the subsurface have moderate to high pyrite contents," AR0000649, meaning they could contribute to acid mine drainage. Thus, the USGS study indicates the potential for acid mine drainage.

### 2. The Corps ignored evidence in the HighGold 2022 report that the Johnson Tract Deposit contains acid-generating sulfides.

The Corps also failed to acknowledge or analyze information in the HighGold 2022 technical report showing the presence of acid-generating sulfides in the Johnson Tract Deposit that the portal is being excavated to access. Pls.' Br. 35. Federal Defendants' primary argument is that "because analysis of scientific data requires a high level of technical expertise," the Court should simply defer to the agency. *See* Feds.' Br. 31-32 (citations omitted). But a reviewing court must determine whether the agency has met the APA's arbitrary and capricious standard. *See Or. Nat. Desert Ass'n*, 625 F.3d at 1109. There is no evidence in the record that the Corps considered the HighGold 2022

report at all. Again, Federal Defendants improperly ask the Court to "defer to a void." *Id.* at 1121; *see also Earth Island Inst. v. Forest Serv.*, 351 F.3d 1291, 1301 (9th Cir. 2003) (An agency is only entitled to deference where the record shows it "made a reasoned decision based on [an] evaluation of the [scientific] evidence.").

Federal Defendants also argue that the HighGold 2022 report "states *nothing* about the potential for acid generation or estimates of how much acid could be generated in the Johnson Tract Deposit." Feds.' Br. 31. On the other hand, Intervenor incorrectly claims that the HighGold 2022 report actually "formed the dataset" underpinning its assessment of the acid mine drainage and metal leaching potential of the rock that would be disturbed by the project. Intrvr.'s Br. 30-31. The HighGold 2022 report does not contain such a dataset, and even if it did, the Corps did not acknowledge or analyze the report's findings about acid-generating sulfides in the Johnson Tract Deposit. Pls.' Br. 35 (citing AR002228; AR002277; AR002280; AR002235; AR002355).

**B.      The Corps failed to take a hard look at JT Mining's plans for portal-excavated rock, potential portal seepage, and blasting material sites.**

The Corps also failed to take a hard look at specific project activities that risk exposure of acid-generating rock and/or acid mine drainage. Combined with the Corps' failure to ensure the integrity of JT Mining's sampling, *see supra* Section II.A, these omissions demonstrate the Corps' overall failure to take a hard look at the risks posed by the project. Pls.' Br. 36-39.

The Corps failed to disclose or analyze JT Mining's plans to blast and crush bedrock material from at least one material site. *Id.* at 36-37. Federal Defendants' claim

*Cook Inletkeeper et al. v. U.S. Army Corps et al.*                                                  18
No. 3:25-cv-00097-SLG

that the Corps was not required to disclose or analyze this particular part of the project, Feds.' Br. 33, is unavailing. The Corps determined that the proper scope of its NEPA analysis included "reasonably foreseeable effects of the proposed airstrip upgrades, access road, exploration portal, material sites, and mitigation sites." AR000124; *see also id.* (acknowledging that the Corps should analyze "environmental consequences" that are "products of the Corps' permit action"); *White Tanks Concerned Citizens, Inc. v. Strock*, 563 F.3d 1033, 1039-40 (9th Cir. 2009) (describing appropriate scope of environmental review under NEPA for 404 permits).

Nor does a separate State authorization for JT Mining's rock crushing operations absolve the Corps of its obligations under NEPA. *Contra* Feds.' Br. 33, 33 n.2. *See Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1103-04 (9th Cir. 2016) (holding that State permitting does not satisfy a federal agency's NEPA duties); *cf. Seven Cnty*, 605 U.S. at 188-89 (explaining that agencies are not required to analyze effects of *separate projects* over which they have no regulatory authority).

Intervenor argues that it "fully disclosed its plans to drill and blast rock." Intrvr.'s Br. 32-33. But Plaintiffs' argument is that the Corps did not disclose or analyze effects from the blasting and crushing in the Decision Memorandum, which contains the requisite NEPA analysis and finding of no significant impact. *See* Pls.' Br. 37. Further, that JT Mining's Environmental Evaluation Document and Mitigation Plan briefly mention blasting does not suffice to meet the Corps' hard look or public disclosure obligations under NEPA. *See WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 925-27 (9th Cir. 2015) (describing NEPA's requirement to provide relevant

information to the public); *Great Basin Res. Watch*, 844 F.3d at 1104 (explaining NEPA's purpose is frustrated where public never had the opportunity to comment on the agency's analysis). Nor do the Decision Memorandum's curt references to dust from the gravel road and airstrip, e.g., AR000145; AR000148; AR000161, substitute for analysis of the effects of blasting and crushing rock, *contra* Intrvr.'s Br. 33.

The Corps also failed to consider the environmental effects of the project's downward sloped portal, including seepage of contaminated water from the portal. Pls.' Br. 38-39; *see also* AR001423-24 (Plaintiff Mueller's comment raising issue of seepage from portal). JT Mining's acknowledgement of the downward sloping portal does not substitute for the Corps' lack of acknowledgement or analysis of its potential for seepage. *See* Feds.' Br. 34; Intrvr.'s Br. 34-35. Federal Defendants' citation to the State 401 Water Quality Certification is also unavailing because it is limited to effects from road and airstrip construction and does not mention a downward sloping portal or seepage. *See* AR000622-26.

The Corps also did not disclose or analyze the project's use of the portal-excavated rock. *See* Pls.' Br. 37-38. Federal Defendants are incorrect that AR000122 contains a disclosure that the excavated portal rock will be used to build the portal pad and laydown and staging pad. Feds.' Br. 34. And other sections of Defendants' briefs contradict these statements. Federal Defendants state that rock excavated from the portal will be used "mainly" in uplands, Feds.' Br. 35, and JT Mining states that one of the potential "disposal sites" for the portal-excavated rock is "5.14 acres of WOTUS," Intrvr.'s Br. 34.

*Cook Inletkeeper et al. v. U.S. Army Corps et al.*                                               20
No. 3:25-cv-00097-SLG

*Contra* AR000147 ("Fill for the project would be locally sourced from proposed material sites . . . [which] consist[] of alluvial or unconsolidated surface deposits.").

Similarly unavailing are Defendants' attempts to explain-away the waste rock disposal site that the Corps failed to disclose or analyze in the Decision Memorandum. Defendants offer inconsistent explanations regarding what the waste rock disposal site is and where the rock will be placed. *Compare* Feds.' Br. 35 (describing waste rock disposal site as the excavated non-acid-generating rock that will be temporarily stockpiled in uplands and later used for project components "mainly in uplands"), *with* Intrvr.'s Br. 33-34 (describing the waste rock disposal site as "the use of portal or material-site rock in identified project features such as the portal pad and portal access road" and stating that "the disposal site is 5.14 acres of WOTUS"). This inconsistency demonstrates that there is no analysis or even common understanding of what the waste rock disposal site is; it is therefore impossible for the Corps to assess or disclose the site's environmental impacts. *See Or. Nat. Desert Ass'n*, 625 F.3d at 1120-21.

**III. The Corps' permitting decision violates the CWA.**

    **A. The Corps had a duty to ensure that its information was adequate and accurate.**

The CWA Guidelines impose an affirmative duty on the Corps to ensure the adequacy of the information it relies on. The Guidelines mandate that the Corps "determine whether the information in the project file is sufficient to provide the documentation required by § 230.11," which requires detailed factual determinations about the nature and degree of effects of the discharge. 40 C.F.R. § 230.5(g), 230.11. The

Corps' duty here must be read in the context of the purposes and policy of the Guidelines: "From a national perspective, the degradation or destruction of special aquatic sites, such as filling operations in wetlands, is considered to be among the most severe environmental impacts covered by these Guidelines." *Id.* § 230.1(d).

**B.      The Corps did not resolve inconsistencies in the record regarding jurisdictional waters in the material sites.**

A comparison of maps of jurisdictional waters with maps of material sites indicates that jurisdictional waters may be located in material sites. *See* Pls.' Br. 42-43 (describing what appear to be jurisdictional waters in Material Sites 3 and 5). Defendants can point to no maps in the record showing both jurisdictional waters and the full extent of the material sites; thus, they can point to no evidence contradicting the record evidence that the material sites appear to contain jurisdictional waters.

Instead of demonstrating that the Corps had adequate information to conclude that the material sites did not intersect jurisdictional waters, Defendants instead ask the Court to assume—as the Corps did—that the missing material sites on the maps do not contain jurisdictional waters.

Federal Defendants primarily point to maps in the record, AR000614-15, and assert that the absence of wetlands in these maps proves the reasonableness of the Corps' analysis. *See* Feds.' Br. 39, 43. But these maps only show small portions of the material sites, making them useless for determining whether there are in fact jurisdictional waters within material sites. And the map that does show the full extent of the material sites, AR000604, does not show jurisdictional waters. In the absence of actual evidence,

*Cook Inletkeeper et al. v. U.S. Army Corps et al.*                                    22
No. 3:25-cv-00097-SLG
Case 3:25-cv-00097-SLG      Document 43      Filed 03/23/26      Page 28 of 32

Federal Defendants instead ask this Court to visualize where the material sites might be in relation to wetlands, stating that an "irregular shape evidences an intent to avoid the nearby stream . . . ." Feds.' Br. 40. This imaginative exercise does not substitute for factual evidence in the record showing that what appears to be overlap, *see* Pls.' Br. 42-43, is not in fact overlap.

For its part, Intervenor cites a table that shows material site acreage and a column called "Impacts to WOTUS" with "no" filled in next to the material sites. Intrvr.'s Br. 37-38 (citing AR000603). The table does not show that material sites and jurisdictional waters will not overlap. Intervenor also asserts that it "provided 132 pages of photographic evidence of the material sites. AR000727-858." Intrvr.'s Br. 37. It is not clear whether the photos at AR000727-858 actually depict material sites. What is clear is that many of the photos include wetlands and streams. *See, e.g.,* AR000729-34.

Maps in the record show the potential for jurisdictional waters within the material sites. AR000607; AR000720; AR000718. Given the foundational importance of determining the extent of jurisdictional waters affected by a proposed action, the Corps' failure to do so is consequential, and is arbitrary and capricious and contrary to law.

### C. The Corps did not resolve conflicts in the record regarding the potential for acid rock drainage and heavy metal contamination.

Plaintiffs showed in their opening brief and *supra* Section II.A that the Corps failed to adequately analyze the acid-generating potential of the excavated rock from the project, including from the material sites for construction. This failure not only violates NEPA; it also prevented the Corps from fulfilling its duty under the CWA to determine

*Cook Inletkeeper et al. v. U.S. Army Corps et al.*                                    23
No. 3:25-cv-00097-SLG
Case 3:25-cv-00097-SLG    Document 43    Filed 03/23/26    Page 29 of 32

"the degree to which the material proposed for discharge will introduce, relocate, or increase contaminants." 40 C.F.R. § 230.11(d); *see Env't Def. v. Army Corps of Eng'rs*, 515 F. Supp. 2d 69, 85 (D.D.C. 2007) (holding that incomplete NEPA analysis prevents "a reliable conclusion that the project satisfies the CWA").

Federal Defendants' primary response is that the court should defer to the Corps' "technical expertise." Feds.' Br. 45. But Plaintiffs have shown that the Corps did not apply technical expertise to the question of acid mine drainage and instead uncritically accepted JT Mining's assertions, despite significant inconsistencies and contradictory information. The Corps did not conduct "a reasoned evaluation of the relevant factors," and this Court is under no obligation to "rubber-stamp" the Corps' decision. *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 793 (9th Cir. 2003) (citation omitted).

That there is a separate State process for regulating water quality, Intrvr.'s Br. 40, does not excuse the Corps from complying with the CWA.[8] In considering an application for a permit to discharge into jurisdictional waters, the CWA requires the Corps to determine "the degree to which the material proposed for discharge will introduce, relocate, or increase contaminants." 40 C.F.R. § 230.11(d). The Corps failed to do so here. The separate process for certification of compliance with State water quality standards, 33 C.F.R. § 320.4, is not at issue here. The Corps has therefore not met its duty under the CWA.

---

[8] Tellingly, Federal Defendants themselves do not make this argument.

*Cook Inletkeeper et al. v. U.S. Army Corps et al.*                                      24
No. 3:25-cv-00097-SLG

## IV.    Remedy

Vacatur is the presumptive remedy for APA violations, 5 U.S.C. § 706(2)(A), and Defendants have not shown any reason why this Court should deviate from that presumption. The Corps' errors are serious and go to the heart of its decision to issue the permit, giving "reason to believe that the agency might disapprove the project" if it met its duties under the ESA, NEPA, and the CWA. *Seven Cnty.*, 605 U.S. at 185. Further, vacatur would not cause environmental harm, as in *Idaho Farm Bureau Federation v. Babbitt*, 58 F.3d 1392, 1405-06 (9th Cir. 1995), and *Audubon Society of Portland v. Army Corps of Engineers*, No. 3:15-cv-665-SI, 2016 WL 4577009, at *16 (D. Or. Aug. 31, 2016), where leaving the agency's decision in place protected ESA-listed species.

## CONCLUSION

The Court should grant summary judgment in favor of Plaintiffs.


Respectfully submitted this 23rd day of March, 2026.


 *s/Marlee Goska*
Marlee Goska (Alaska Bar No. 2305043)
Rebecca Noblin (Alaska Bar No. 0611080)
Kristen Monsell (*pro hac vice*)
Center for Biological Diversity

Roger Flynn (*pro hac vice*)
Western Mining Action Project

*Attorneys for Plaintiffs*


*Cook Inletkeeper et al. v. U.S. Army Corps et al.*    25
No. 3:25-cv-00097-SLG
Case 3:25-cv-00097-SLG    Document 43    Filed 03/23/26    Page 31 of 32

# CERTIFICATE OF SERVICE

I certify that on March 23, 2026, a copy of the foregoing Plaintiffs' Reply Brief was served electronically through the CM/ECF system on counsels of record.

*Marlee Goska*
Marlee Goska
Center for Biological Diversity

*Cook Inletkeeper et al. v. U.S. Army Corps et al.*
No. 3:25-cv-00097-SLG
Case 3:25-cv-00097-SLG    Document 43    Filed 03/23/26    Page 32 of 32