**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| COOK INLETKEEPER, *et al.*,<br><br>Plaintiffs,<br>v.<br><br>U.S. ARMY CORPS OF ENGINEERS, *et al.*,<br><br>Defendants,<br><br>and<br><br>JT MINING, INC.,<br><br>Intervenor-Defendant. | Case No. 3:25-cv-00097-SLG |

## DECISION AND ORDER

Before the Court at Docket 37 is Plaintiffs' Motion for Summary Judgment.[1] Federal Defendants responded in opposition and cross-moved for summary judgment at Docket 40.[2] Intervenor-Defendant JT Mining, Inc. also responded in opposition and cross-moved for summary Judgment at Docket 42. Plaintiffs replied in support of their motion for summary judgment at Docket 43. Oral

[1] Plaintiffs are Cook Inletkeeper; Chickaloon Village Traditional Council; Center for Biological Diversity; and Anna-Maria Mueller. Docket 1 at ¶¶ 11-19.

[2] Federal Defendants are the U.S. Army Corps of Engineers; Lieutenant William H. Graham, Jr., sued in his official capacity as the Chief of Engineers and Commanding General of the Corps; and Colonel Jeffrey S. Palazzini, sued in his official capacity as the Commander of the Corps' Alaska District. Docket 1 at ¶¶ 21-23.

argument was not requested and was not necessary to the Court's determination.

## BACKGROUND

This case challenges Federal Defendants' approval of a Clean Water Act (CWA) Section 404 Permit that allows Intervenor-Defendant JT Mining to discharge fill into waters of the United States (WOTUS) on the Johnson Tract, a 20,942-acre private inholding within Lake Clark National Park.[3] The project area is at the headwaters of the Johnson River, which flows through Lake Clark National Park before emptying into Cook Inlet.[4] Tuxedni Bay lies approximately ten miles to the east of the project area.[5] The Lake Clark National Park coastline, including the outlet of the Johnson River and Tuxedni Bay, contains critical habitat for the endangered Cook Inlet beluga whale.[6] Tuxedni Bay is an important fall and winter foraging ground for Cook Inlet beluga whales.[7] Scientists have noted the importance of keeping Tuxedni Bay quiet due to the whale's sensitivity to anthropogenic noise.[8]

In 2023, JT Mining applied to the U.S. Army Corps of Engineers (the Corps)

---

[3] AR000123; AR000159-61; AR000960; AR001664-66.

[4] AR00161.

[5] AR000945.

[6] Endangered and Threatened Species; Endangered Status for the Cook Inlet Beluga Whale, 73 Fed. Reg. 62919 (Oct. 22, 2008); Endangered and Threatened Species: Designation of Critical Habitat for Cook Inlet Beluga Whale, 76 Fed. Reg. 20180, 20205 (Apr. 11, 2011) (Area 2); *see also* AR000135.

[7] AR0002428-29.

[8] AR002429, AR002469.

for a CWA permit to discharge fill within WOTUS on the Johnson Tract. The purpose of the Permit is to facilitate the construction of an access road to a mineral exploration portal site, the realignment and expansion of an airstrip that already exists on the Johnson Tract, and the establishment of up to six material sites to obtain fill for the road and airstrip construction.[9]

After soliciting, receiving, and reviewing public comments on the proposed Permit, in August 2024, the Corps issued its Memorandum for Record approving the Permit.[10] As relevant to Plaintiffs' claims, the Memorandum states that

> Fill for the project would be locally sourced from proposed material sites. Most of the Johnson River valley, including the material sites, consists of alluvial or unconsolidated surficial deposits (rock that was deposited by glaciers and is loosely arranged). The dominant geological unit in the area (Talkeetna formation) has been identified as environmentally inert (not biologically or chemically reactive). The applicant has conducted technical analyses to assess the acid rock drainage (ARD) and metal leaching (ARD/ML) potential of the rock being disturbed. Acid Base Accounting (ABA) sampling has been conducted for material sites, and all samples were classified as nonacid generating.[11]

Although it is not mentioned in the Memorandum, JT Mining's Mitigation Plan and Environmental Evaluation Document indicate that JT Mining plans to blast and

---

[9] AR000125 ("The overall project purpose is to construct an airstrip and access road to provide access for people, equipment, and vehicles to an uplands exploratory drilling site."); AR001664-65, AR001964-69.

[10] AR000126-27; AR000173-74; AR001476. The Corps also consulted with several Alaska Native Tribes. AR000126; AR000166-67; AR001455.

[11] AR000147.

crush bedrock material from at least one material site.[12]

For purposes of the Endangered Species Act (ESA), the Corps did not include Tuxedni Bay in the action area but instead limited the action area for the aquatic environment to three miles downstream of the proposed project.[13] In the Memorandum, the Corps concluded that consultation with the National Marine Fisheries Service under Section 7 of the ESA was not required because the action's effects do "not extend into Tuxedni Bay or the Cook Inlet, which is where beluga whales and their critical habitat . . . are located."[14]

Regarding its review under the National Environmental Policy Act (NEPA), the Corps determined that the scope of its "analysis includes the footprint of the proposed project in WOTUS, the uplands in the immediate vicinity of impacted WOTUS, the material sites used to provide fill materials for the proposed activity, the proposed mitigation sites, the portal pad, and the portal."[15]

The Corps issued the Permit in September 2024; it authorizes "[t]he discharge of a total of 67,800 cubic yards of general embankment fill and 5,200

[12] AR000042 (JT Mining Mitigation Plan as appended to the Permit); AR000953 (JT Mining's Environmental Evaluation Document noting that "JTMI may utilize a portable rock crusher at one or more of the material sites to produce surface fill material for the access road. Rock Crusher operations will be authorized under the ADEC General Permit (MG9) for rock crusher facilities").

[13] AR000124.

[14] AR000135; *see also* AR000163 ("Section 7 ESA Consultation was not required as there are no listed or proposed species and/or designated critical habitat or proposed critical habitat present or in the vicinity of the Corps' action area.").

[15] AR000124.

cubic yards of surfacing material into 5.14 acres of WOTUS" to construct a 2.3-mile-long portal access road and to realign and expand the existing airport to a length of 5,000 feet.[16]

On May 20, 2025, Plaintiffs brought this suit challenging Federal Defendants' approval of the Permit pursuant to the Administrative Procedure Act (APA).[17] As relief, Plaintiffs seek a declaratory judgment finding that the issuance of the Permit violates the ESA, NEPA, and CWA and vacatur of the Memorandum and Permit.[18] On August 20, 2025, JT Mining was permitted to intervene as a Defendant.[19]

## JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which "confer[s] jurisdiction on federal courts to review agency action, regardless of whether the APA of its own force may serve as a jurisdictional predicate."[20]

## LEGAL STANDARD

Section 706 of the APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . .

---

[16] AR000008.

[17] Docket 1 at ¶¶ 78-93.

[18] Docket 1 at 39.

[19] Docket 21.

[20] *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] in excess of statutory jurisdiction, authority, or limitations[.]"[21]

Agency action is arbitrary and capricious if it:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[22]

"In other words, there must be 'a clear error of judgment.'"[23]

By contrast, agency action is proper if "the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made."[24] "This standard of review is 'highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision.'"[25] "[A] court is not to substitute its judgment for that of the agency," and such deference is especially appropriate where "the challenged decision implicates substantial agency expertise."[26] Indeed, "[j]udicial review . . .

---

[21] 5 U.S.C. § 706(2)(A),(C).

[22] *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1067 (9th Cir. 2018) (quoting *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011)).

[23] *League of Wilderness Defs.-Blue Mountains Biodiversity Proj. v. U.S. Forest Serv.*, 549 F.3d 1211, 1215 (9th Cir. 2008) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

[24] *Ctr. for Biological Diversity*, 900 F.3d at 1067 (quoting *Greater Yellowstone Coal.*, 665 F.3d at 1023).

[25] *Ctr. for Biological Diversity v. BLM*, 833 F.3d 1136, 1146 (9th Cir. 2016) (quoting *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1115 (9th Cir. 2007)).

[26] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

must be at its most deferential 'when an agency makes . . . predictive or scientific judgments.'"[27]

## DISCUSSION

### I. Endangered Species Act

#### *a. Standing*

Before considering the merits of Plaintiffs' ESA claim, the Court must resolve Federal Defendants' challenge to Plaintiffs' standing to bring that claim.[28] A plaintiff seeking relief in federal court must establish three elements: the plaintiff has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision[.]"[29]

"This standard 'is softened when a plaintiff asserts a violation of a procedural right' conferred by a federal statute . . . because 'the causation and redressability requirements [for standing] are relaxed[.]'"[30] To establish an injury under this softened standard, "a plaintiff must show that '(1) the [agency] violated certain procedural rules; (2) these rules protect [a plaintiff's] concrete interests; and (3) it

---

[27] *Ariz. Mining Reform Coal. v. U.S. Forest Serv.*, 172 F.4th 641, 661 (9th Cir. 2026) (quoting *Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 182 (2025)).

[28] Docket 40 at 16-21.

[29] *Friends of the Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 918 (9th Cir. 2018) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).

[30] *Id.* (alteration in original) (first quoting *San Luis & Delta-Mendota Water Auth. v. Haugrud*, 848 F.3d 1216, 1232 (9th Cir. 2017); and then quoting *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015)).

is reasonably probable that the challenged action will threaten their concrete interests.'"[31] "To establish causation and redressability, the plaintiff must show that 'the relief requested—that the agency follow the correct procedures—may influence the agency's ultimate decision.'"[32] "[A]lleged violations of Section 7(a)(2)'s consultation requirement constitute a procedural injury for standing purposes."[33]

"When there are multiple plaintiffs, '[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint.'"[34] For an organizational plaintiff to have standing, "it must demonstrate that at least one of its 'members would otherwise have standing to sue in [the member's] own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'"[35]

i. Injury

Federal Defendants assert that Plaintiffs have not shown that their alleged injury—harm to the endangered Cook Inlet beluga whale due to increased heavy

---

[31] *Id.* (alterations in original) (quoting *Haugrud*, 848 F.3d at 1232).

[32] *Id.* (quoting *WildEarth Guardians*, 795 F.3d at 1156).

[33] *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 783 (9th Cir. 2014) (en banc).

[34] *Friends of the Santa Clara River*, 887 F.3d at 917 (alteration in original) (quoting *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017)).

[35] *Id.* at 917-18 (alteration in original) (quoting *Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013)).

aircraft flight activity over Tuxedni Bay—is actual or imminent because the Permit only authorizes the discharge of fill into WOTUS on the Johnson Tract and "does not authorize the flying of aircraft into or out of Johnson Tract, let alone over Tuxedni Bay ten miles away."[36] Federal Defendants further maintain that Plaintiffs' alleged harm is premised on the effects of project-related aircraft noise on beluga whales in Tuxedni Bay, a winter foraging ground for the whales, but that the Permit contemplates that construction and exploration activities will only occur from May 1 to October 15.[37]

The Ninth Circuit rejected a similar challenge to standing in *Friends of the Santa Clara River*. In that case, the defendant argued that the plaintiff organizations lacked standing to challenge the Corps' ESA analysis regarding the project's impact on steelhead because "the plaintiffs' interests [were] limited to recreation and natural resources *within* the Project area, where steelhead are not present."[38] In rejecting this argument, the Ninth Circuit held that "the challenged agency action is the Corps's issuance of the Section 404 permit, and so the plaintiffs need show only that the issuance of the permit will affect their interest in recreation and aesthetics in the Project area; they do not need to show that the alleged inadequacies in the Corps's analysis of the Project's impact on steelhead

---

[36] Docket 40 at 17 (emphasis omitted).

[37] Docket 40 at 18 (citing AR001502 (JT Mining's State of Alaska Application for Permits to Mine in Alaska setting a start-up date of May 1 and a shutdown date of October 15)).

[38] *Friends of the Santa Clara River*, 887 F.3d at 919 (emphasis in original).

will have such an effect."[39]

Here, the Court finds that at least one Plaintiff has alleged that the Corps violated Section 7 of the ESA, that Section 7 protects that Plaintiff's concrete aesthetic interests, and it is reasonably probable that the challenged Permit will threaten her concrete interests in the action area.[40] Specifically, Plaintiff Anna-Maria Mueller averred that she has aesthetic interests in "observing and photographing wildlife in this area. This includes bears, many of whom also frequent the Johnson River and cross over to Tuxedni Bay through Bear Creek."[41] She further stated that "[d]isturbance to wildlife, like bears, would also occur from project work at Johnson Tract, including noise pollution from construction on the ground and from increased aircraft traffic. Some of these effects, especially the large aircraft, would also disturb me directly when I am in Tuxedni Bay."[42] The Court finds that this is sufficient to establish Ms. Mueller's standing to bring the ESA claim, as she has shown "that the issuance of the permit will affect [her] interest in recreation and aesthetics in the Project area" and she does "not need to show that the alleged inadequacies in the Corps's analysis of the Project's

---

[39] *Id.; see also id.* (citing *WildEarth Guardians v. Jewell*, 738 F.3d 298, 307 (D.C. Cir. 2013) ("The Appellants' aesthetic injury follows from an inadequate FEIS whether or not the inadequacy concerns the same environmental issue that causes their injury.")).

[40] *See Friends of the Santa Clara River*, 887 F.3d at 918.

[41] Docket 37-2 at ¶ 21.

[42] Docket 37-2 at ¶ 21.

impact on [Cook Inlet beluga whales] will have such an effect."[43]

ii. Causation and Redressability

For cases alleging a procedural deficiency, "[t]o establish causation and redressability, the plaintiff must show that 'the relief requested—that the agency follow the correct procedures—may influence the agency's ultimate decision.'"[44] Federal Defendants assert that Plaintiffs have "fail[ed] to show their harms are fairly traceable to the Permit" because "the effects of any aircraft traffic are traceable to other actions and actors—not the Corps."[45] And, "[f]or similar reasons," Federal Defendants maintain that "Plaintiffs cannot establish that a favorable decision would redress their alleged injuries."[46]

The Court notes that Federal Defendants appear to apply the traditional test for standing, not the "softened" standard applicable to the procedural violation alleged here.[47] The Court finds that under the applicable standard, at least one Plaintiff, Ms. Mueller, has shown that if the Corps engaged in Section 7 consultation with the National Marine Fisheries Service (NMFS) regarding the Cook Inlet beluga whale, such consultation may influence the Corps' ultimate

[43] *Friends of the Santa Clara River*, 887 F.3d at 919.

[44] *Id.* at 918 (quoting *WildEarth Guardians*, 795 F.3d at 1156).

[45] Docket 40 at 19.

[46] Docket 40 at 20.

[47] *Friends of the Santa Clara River*, 887 F.3d at 918.

decision, and hence both causation and redressability have been established.[48]

*b. Merits*

Turning to the merits of Plaintiffs' ESA claim, Plaintiffs maintain that the Corps violated Section 7 of the ESA by improperly defining the action area and concluding that consultation with NMFS regarding the endangered Cook Inlet beluga whale was not necessary.[49] According to Plaintiffs, "[t]he project 'may affect' the Cook Inlet beluga whale and its designated critical habitat" because "the available information indicates that project-related aircraft would likely travel over this key beluga habitat on the way to and from Anchorage."[50] Federal Defendants respond that "the Corps properly delineated the scope of the proposed Permit's effects and used it determine the action area for the Corps' and NMFS's analysis" and because "the airspace over Tuxedni Bay does not fall within the physical scope of the Permit's indirect impacts, the Corps also need not have considered flights occurring there when defining the action area."[51] Therefore, according to Federal Defendants, "no ESA-listed species or critical habitat were present in the action

---

[48] *See id.* ("[P]laintiffs asserting violations of the ESA's consultation requirements are 'not required to establish what a Section 7 consultation would reveal, or what standards would be set.'" (quoting *Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1082 (9th Cir. 2015))).

[49] Docket 37 at 17-28.

[50] Docket 37 at 19, 22.

[51] Docket 40 at 22-23.

area [and] the Corps reasonably concluded that consultation was not required."[52]

"Under § 7(a)(2), agencies must ensure that their actions are 'not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species.'"[53] To make this determination, the agency defines the "action area" for the project. The action area must include "all areas to be affected directly or indirectly by the Federal Action and not merely the immediate area involved in the action."[54] "[T]he determination of the scope of an analysis area requires application of scientific methodology and, as such, is within the agency's discretion."[55] "If listed species 'may be present' in an agency's project area, the agency must conduct a 'biological assessment' to identify listed species 'likely to be affected' by the project."[56] "If the agency determines that its proposed action 'may affect' any listed species or its critical habitat, then consultation—either formal or informal—is required."[57] But no form of consultation is required if the "action will

---

[52] Docket 40 at 26.

[53] *Ctr. for Biological Diversity v. BLM*, 141 F.4th 976, 1011 (9th Cir. 2025) (quoting 16 U.S.C. § 1536(a)(2)).

[54] 50 C.F.R. § 402.02.

[55] *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 902 (9th Cir. 2002) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976)).

[56] *Ctr. for Biological Diversity*, 141 F.4th at 1011 (quoting 16 U.S.C. § 1536(c)(1)).

[57] *Id.* (quoting *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012)).

have 'no effect' on a listed species or critical habitat."[58] "[A]n agency's 'no effect' determination under the ESA must be upheld unless arbitrary and capricious."[59]

Here, the Corps defined the action area as

> all components of the proposed project (the airstrip, road, and portal site) plus an area of 300 feet surrounding the project components, which is the maximum extent to which any noise disturbance could be detected. Also included in the action area is the aquatic environment (specifically, the Johnson River headwaters) up to 3 miles downstream of the proposed project, which is the furthest maximum extent that detectable changes are expected in the aquatic environment.[60]

The Corps determined that "[t]he action area for this proposed project does not extend into Tuxedni Bay or the Cook Inlet, which is where beluga whales and their critical habitat . . . are located."[61] Accordingly, the Corps concluded that "Section 7 ESA Consultation was not required as there are no listed or proposed species and/or designated critical habitat or proposed critical habitat present or in the vicinity of the Corps' action area."[62]

Plaintiffs maintain that the Corps' definition of the action area was arbitrary and capricious because "evidence indicat[es] that the heavy aircraft the project enables will likely fly low over or near [Tuxedni] Bay on the way to and from

---

[58] *Id.* (quoting *Karuk Tribe of Cal.*, 681 F.3d at 1027).

[59] *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir. 2011).

[60] AR000124.

[61] AR000135.

[62] AR000163.

Anchorage."[63] Plaintiffs rely on three cases in support of their position that the action area must include Tuxedni Bay. First, in *Native Ecosystems Council v. Dombeck*, the plaintiffs challenged a timber sale on 226 acres of national forest lands in Montana.[64] Specifically, the plaintiffs argued that the Forest Service's biological assessment unlawfully defined the action area in considering the effects of the timber sale on the threatened grizzly bear as required by the ESA.[65] The Forest Service had defined the action area as extending 16.5 miles in one direction from the project site, but only 1.5 miles to the east of the project site, stopping just short of a sheep grazing allotment.[66] The record demonstrated that the sheep grazing allotment could pose a danger to bears displaced by the timber sale because of the potential for the bears to be removed or killed in the allotment area due to conflicts with livestock.[67]

The Ninth Circuit held that the action area selected by the Forest Service failed to include "all areas to be affected (directly or indirectly) by the timber sale" because "[t]here is no indication in the record that the Forest Service considered which areas would actually be affected by the sale (by determining, for instance,

---

[63] Docket 37 at 27.

[64] 304 F.3d at 889-90; *see also* Docket 37 at 27-28.

[65] *Native Ecosystems Council*, 304 F.3d at 901.

[66] *Id.* at 901-02.

[67] *Id.* at 902.

where displaced bears might wander)."[68] Moreover, the biological assessment "contain[ed] no discussion of scientific methodology, relevant facts, or rational connections linking the project's potential impacts with the [action area's] boundaries. For example, the Forest Service [did] not discuss or justify its decision to restrict its analysis to within this area despite the fact that the proposed timber sale will occur very near the eastern border of the [action area]" and it did "not mention the sheep grazing allotment."[69] The Ninth Circuit held that the biological assessment therefore violated the ESA.[70]

Plaintiffs suggest that, like the Forest Service in *Native Ecosystems Council*, the action area here "fails to encompass all of the project's reasonably foreseeable effects and is therefore arbitrarily restricted."[71] But the Court finds the instant case is distinguishable from *Native Ecosystems Council*. There, the threatened grizzly bear occupied the national forest lands subject to the timber sale and therefore the Forest Service had to consider which areas would actually be affected by the sale—i.e., where the bears might actually wander. Here, the Cook Inlet beluga whale does not occupy the Johnson Tract and will not be displaced by the Project.

---

[68] *Id.*

[69] *Id.*

[70] *Id.*

[71] Docket 37 at 26-27.

Further, in *Native Ecosystems Council*, the Ninth Circuit held that the Forest Service acted arbitrarily in failing to explain why it had excluded the sheep grazing allotment.[72] Here, in contrast, the Corps provided a reasoned basis for its definition of the action area for ESA purposes, which not only included "all components of the proposed project (the airstrip, road, and portal site)" but also "an area of 300 feet surrounding the project components, which is the maximum extent to which any noise disturbance could be detected," and "the aquatic environment (specifically, the Johnson River headwaters) up to 3 miles downstream of the proposed project, which is the furthest maximum extent that detectable changes are expected in the aquatic environment."[73]

As for why the Corps did not consider the impact of a potential future mine and any flights to the Johnson Tract associated with mining operations—as Plaintiffs contend the Corps should have done—the Corps determined that a future mine was "speculative in nature" and "[a] potential future mining operation/port is not within the scope of analysis for the proposed project."[74] And in response to a public comment, the Corps explained that "[t]he regulation of air traffic in the National Park is under the purview of the National Park Service (NPS); however, noise effects and impacts to scenery, wildlife, and subsistence are considered in

[72] *Native Ecosystems Council*, 304 F. 3d at 902.

[73] AR000124.

[74] AR000129; AR000135.

Section 6.4."[75] Section 6.4 of the Memorandum, in turn, explained that there were no threatened or endangered species with a known or historic range within the Corps' scope of analysis and then evaluated the impacts of the Permit on fish, other aquatic organisms, moose, caribou, black bear, brown bear, and wolves.[76]

Because this Court's review "must be at its most deferential 'when an agency makes . . . predictive or scientific judgments,'"[77] the Court finds that the Corps' definition of the action area to exclude Tuxedni Bay—a determination that "requires application of scientific methodology . . . [and] is within the agency's discretion,"[78]—was not arbitrary and capricious.[79] *Native Ecosystems Council* does not compel a finding otherwise.

Next, Plaintiffs rely on *Center for Biological Diversity v. Regan*.[80] In that case, the Environmental Protection Agency (EPA) approved the State of Florida's application to assume permitting authority under Section 404 of the CWA for all waters within the State of Florida, along with "broad ESA liability protection on all

---

[75] AR000128.

[76] AR000141-44.

[77] *Ariz. Mining Reform Coal.*, 172 F.4th at 661 (quoting *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 182).

[78] *Native Ecosystems Council*, 304 F.3d at 902 (citing *Kleppe*, 427 U.S. at 414).

[79] *See Friends of the Santa Clara River*, 887 F.3d at 923-24 (rejecting the plaintiffs' ESA challenge to the Corps' determination that the federal action would have no effect on steelhead in the Santa Clara River because "the Corps reasonably concluded that the Project's discharges of dissolved copper would not affect steelhead downstream").

[80] Docket 37 at 27 (quoting *Ctr. for Biological Diversity v. Regan*, 734 F. Supp. 3d 1, 59 (D.D.C. 2024)).

future state permittees for incidental take resulting from *state*-issued dredge and fill permits."[81] The EPA did not consult with NMFS before approving Florida's application because it determined that no ESA-listed species under NMFS' jurisdiction are found "in the waters that are assumable" by Florida.[82] The District Court for the District of Columbia held that the EPA had "misapprehend[ed] the relevant 'action area.'"[83] The district court so concluded because the record showed that "'freshwater eventually makes its way to the nearly 2,000 miles of Florida coastline and marine ecosystem,' . . . raising the prospect that the EPA's action might affect listed species outside assumable waters."[84] The district court held that, "[a]t a minimum, the EPA was required to provide a reasoned basis for considering affects only in the assumable waters and . . . [its] failure to offer a reasoned basis for that omission[] runs afoul of the APA's arbitrary and capricious standard."[85]

This case is distinguishable from *Regan*. As Federal Defendants note, that case rejected the EPA's determination that the wholesale transfer of Section 404 authority from the Corps to the State of Florida for all permitting in inland waters would have no effect on the 2,000 miles of Florida coastline and the listed species

---

[81] *Regan*, 734 F. Supp. 3d at 12 (emphasis in original).

[82] *Id.* at 10, 59.

[83] *Id.* at 59.

[84] *Id.*

[85] *Id.*

found in that marine ecosystem.[86] Here, the scope of the project authorized by the Permit is much smaller, allowing JT Mining to discharge 5.14 acres of fill into WOTUS to construct a road and enlarge the existing airstrip. Additionally, in *Regan*, the EPA's no effects determination for coastal waters was at odds with the record before the agency and the agency did not provide a reasoned basis for its determination. In contrast, here, as explained above, the Court finds that the Corps provided a reasoned basis for its definition of the action area and its conclusion that consultation regarding Cook Inlet beluga whales was not required.

Plaintiffs also cite *Wilderness Society v. Wisely.*[87] In that case, the Bureau of Land Management (BLM) leased 16 parcels of land for oil and gas development, nine of which were known to have incidences of hookless cactus, an ESA threatened species.[88] BLM consulted with the U.S. Fish and Wildlife Service as to the effects of oil and gas development on the 9 parcels with hookless cactus, but not as to the other parcels.[89] The plaintiffs successfully argued to the district court that "development on other parcels might have impacts that affect the hookless cactus in ways that development on the 9 parcels themselves might not" and therefore BLM had to consult on those parcels too.[90] The district court noted that

---

[86] Docket 40 at 25.

[87] Docket 37 at 28 (citing 524 F. Supp. 2d 1285, 1305 (D. Colo. 2007)).

[88] *Wilderness Soc'y*, 524 F. Supp. 2d at 1292-93, 1298, 1305.

[89] *Id.* at 1305.

[90] *Id.* at 1305.

the record showed several "types of adverse effects that might spill over from unchecked development on parcels not containing the cactus, and cause harm to the cactus on parcels where development is more restricted" and therefore, "the agencies' conferral under the ESA was insufficient to encompass all potential adverse effects resulting from development in the action area" and as such was arbitrary and capricious.[91]

In *Wilderness Society*, the district court held that BLM had to consider the effect of oil and gas development on leased parcels that did not contain the threatened cactus because the agency's record demonstrated that development on those parcels could impact the adjacent parcels where the cactus was found.[92] Plaintiffs suggest that the same is true here; the Corps was required to consult with NMFS because the Permit "may affect" Cook Inlet beluga whales due to increased flight noise over Tuxedni Bay. But, unlike the BLM action in *Wilderness Society*, the Permit does not authorize any fill of WOTUS adjacent to or close to Tuxedni Bay, which is approximately ten miles from the Johnson Tract. Further, the Permit authorizes the discharge of fill into WOTUS to build a road and expand an airstrip; it does not itself authorize any flights to or from the Johnson Tract or over Tuxedni Bay.[93] The Court finds that *Wilderness Society* does not support a finding that

[91] *Id.*

[92] *Id.*

[93] *See* Docket 40 at 19 ("As noted, the Permit does not authorize flight activity, nor does it convey a legal right to use the airstrip. Instead, because the Johnson Tract is surrounded by Lake Clark National Park, aircraft activity into and out of the site is subject to other federal

Federal Defendants acted arbitrarily and capriciously in defining the action area and reaching the no effects determination.

In sum, the Court finds that the Corps' definition of the action area for ESA purposes to exclude Tuxedni Bay was not arbitrary and capricious; nor was its conclusion that the Permit would have no effect on any listed species. Therefore, consultation under Section 7 was not required, and Federal Defendants and Intervenor-Defendant are entitled to summary judgment on Plaintiffs' ESA claim.

## II. National Environmental Policy Act

Plaintiffs maintain that the Corps violated NEPA by approving the Permit without taking the requisite hard look at the environmental impacts of the project.[94] Federal Defendants and Intervenor-Defendant disagree.[95]

"NEPA does not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions."[96] "NEPA requires agencies to consider all important aspects of a problem" and to "engage with [any]

---

authorizations that dictate air transportation." (citing AR000946; AR000128 ("The regulation of air traffic in the National Park is under the purview of [NPS.]"); AR001610-11; AR001620-26 (NPS issuing right-of-way to HighGold Mining allowing helicopter access over Lake Clark National Park)).

[94] Docket 37 at 28-39.

[95] Docket 40 at 28-32; Docket 42 at 21-35.

[96] *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 979-80 (9th Cir. 2022) (internal quotation marks and citation omitted).

considerable contrary scientific and expert opinion[.]"[97] However, "once [a court is] satisfied that a proposing agency has taken a hard look at a decision's environmental consequences, [the court's] review is at an end."[98] "Thus, while 'NEPA requires the agency to analyze environmental impacts and prepare documents and make such analyses available for public inspection, NEPA does not require the agency to weigh environmental consequences in any particular way.'"[99] "As the Supreme Court has recently reiterated, '[t]he bedrock principle of judicial review in NEPA cases can be stated in a word: Deference.'"[100]

*a. Acid Mine Drainage and Metals Leaching*

Plaintiffs maintain that the Corps "failed to verify the information provided by JT Mining, including following up with JT Mining about missing information," and assert that federal regulations require the Corps to independently verify the environmental information provided to it by JT Mining.[101]

As an initial matter, Federal Defendants disagree with Plaintiffs' assertion

---

[97] *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 871 (9th Cir. 2020) (citation omitted).

[98] *Friends of Se.'s Future v. Morrison*, 153 F.3d 1059 (9th Cir. 1998) (internal quotation marks and citation omitted).

[99] *Friends of Animals v. Burgum*, 164 F.4th 738, 750 (9th Cir. 2026) (additional internal quotation marks omitted) (quoting *Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, 153 F.4th 869, 880 (9th Cir. 2025)).

[100] *Id.* (quoting *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 185).

[101] Docket 37 at 28, 30 & n.2 (citing 42 U.S.C. § 4332(2)(D), (E); 33 C.F.R. Pt. 325 App. B § 8(f)(2) (effective to July 2, 2025); 33 C.F.R. § 333.51(a)). As Plaintiffs note, while the Corps revised its regulations implementing NEPA in July 2025, 90 Fed. Reg. 29465 (July 3, 2025), the Court "look[s] to the regulations in place at the time of the challenged decision." *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 879 n.5 (9th Cir. 2022).

that the Corps is required to independently verify the information provided by JT Mining.[102] Federal Defendants quote *Friends of the Earth v. Hintz* for the proposition that "[t]he Corps' regulations do not require the Corps to undertake an independent investigation or to gather its own information upon which to base an [Environmental Assessment (EA)]."[103] However, in *Friends of the Earth* the Ninth Circuit continued: "But the Corps' regulations do say that when information for an EA is prepared by the applicant, 'the district engineer is responsible for independent verification and use of the data, evaluation of the environmental issues, and for the scope and content of the EA.'"[104] Therefore, the Court finds that while the Corps did not have to independently procure information for its environmental assessment, it was obligated to independently verify the data provided to it by JT Mining.

Plaintiffs contend that the Corps did not do so because, in the Memorandum, the Corps "adopted JT Mining's statements that 'geochemistry for material related to the project appears to be non-acid generating and non-metal leaching'" and "concluded that, 'given the multiple test results showing low potential for [acid rock

[102] Docket 40 at 28 ("Plaintiffs incorrectly quote language from the Corps' regulations which refer to the preparation of an EIS, not EA. That regulation states that when preparing an EIS, the Corps 'should document in the record the Corps independent evaluation of the information and its accuracy.'" (first citing Docket 37 at 30 (quoting 33 C.F.R. pt. 325 App. B § 8(f)(2) (effective to July 2, 2025)); and then quoting 33 C.F.R. pt. 325 App. B § 8(f)(2) (effective to July 2, 2025))).

[103] Docket 40 at 28 (quoting *Friends of the Earth v. Hintz*, 800 F.2d 822, 834-35 (9th Cir. 1986)).

[104] *Friends of the Earth*, 800 F.2d at 835 (quoting 33 C.F.R. pt. 230, App. B § 8(b)).

drainage], the possibility of a large release of [acid rock drainage] is highly unlikely.'"[105]

First, Plaintiffs maintain that "the Corps ignored inconsistences in the record" regarding "which areas or components of the project were actually tested" because nothing in the record suggests that sampling of the material sites occurred and yet the Corps concluded that "sampling has been conducted for material sites, and all samples were classified as nonacid generating."[106] The record indicates that JT Mining performed geochemical testing on ten samples "representative of the rock mass that will be transected by the proposed underground exploration ramp and" two potential material sites.[107] The Environmental Evaluation provided by JT Mining stated that the samples were "specifically taken to represent the rock that will be intersected from the Proposed Action, as well as some surface samples around the proposed portal site."[108] All of those samples—except for Sample 5, which the Environmental Evaluation stated was "a possible exception" believed to be an outlier and subject to resampling—were "low-sulphur, and non-potentially acid draining."[109] The fact that samples were not taken from each of the potential

---

[105] Docket 37 at 31-32 (quoting AR000966 and AR000147-48).

[106] Docket 37 at 32-33 (quoting AR 000147).

[107] AR001850. The record reflects that four of the six material sites "are not biologically or chemically reactive," as they consist of alluvial gravels. AR000147; AR000967.

[108] AR000966.

[109] AR000966.

material sites does not make arbitrary and capricious the Corps' conclusion that "the geochemistry for material related to the project appears to be non-acid generating and non-metal leaching."[110]

Plaintiffs further contend that the Corps failed to independently verify the information provided by JT Mining because it did not "inquire[] into Sample 5," attempt[] to obtain the" full geochemical report, or "ask[] for the additional sampling JT Mining promised."[111] However, the presence of one apparent outlier sample when nine of ten other representative samples were "low-sulphur, and non-potentially acid draining" does not render the Corps' conclusion that the material related to the project "appears to be non-acid generating and non-metal leaching" arbitrary and capricious.[112] Indeed, the Corps also reviewed a United States Geological Survey from 2003 that examined the geochemistry of the Johnson River, which "found that rock samples indicated low acid-generating potential."[113] Apart from the missing Sample 5, Plaintiffs do not point to other evidence in the record that suggests that the samples taken were not representative of the material sites or that the material sites may cause acid rock drainage.

Plaintiffs also maintain that the Corps failed to independently verify the

---

[110] AR000148.

[111] Docket 37 at 35.

[112] AR000966; AR000148.

[113] AR000147.

information provided by JT Mining because a 2022 report prepared by independent consultants for HighGold Mining (JT Mining's parent company) "shows the presence of acid-generating sulfides in the Johnson Tract Deposit, which the portal is being excavated to access."[114] Plaintiffs contend that the Corps' failure to consider the HighGold report was arbitrary and capricious.[115]

Federal Defendants respond that the HighGold Report "speaks to the characterization of mineable minerals; it states *nothing* about the potential for acid generation or estimates of how much acid could be generated in the Johnson Tract Deposit."[116] Federal Defendants further argue that Plaintiffs do not provide "any support for their conclusory statement" about "the potential to generate acid and leach heavy metals" in the Johnson Tract Deposit.[117] Intervenor-Defendant maintains that the HighGold Report "formed the dataset for the pHase geochemistry analysis summarized in the [Environmental Evaluation]," which the Corps considered in its Memorandum.[118]

In their reply, Plaintiffs suggest that Federal Defendants' statement that the HighGold report states nothing about the potential for acid generation conflicts with

---

[114] Docket 37 at 35; AR000944; *see* AR002213-312 (HighGold Report).

[115] Docket 43 at 23-24.

[116] Docket 40 at 31 (emphasis in original).

[117] Docket 40 at 32 (quoting Docket 37 at 35).

[118] Docket 42 at 30 (citing AR000966 (explaining that one of two sample sets described in the technical analysis is "a HighGold set (JT Mining) from 2022")).

Intervenor-Defendant's claim that the dataset underlying the HighGold report was assessed in the Environmental Evaluation for the Project.[119] The Environmental Evaluation states that it analyzed a 2022 HighGold data set. But it appears that the HighGold report and the Environmental Evaluation were assessing different characteristics of the sample set HighGold collected in 2022, as the HighGold report assessed mineable materials from the samples whereas the Environmental Evaluation assessed the potential for acid generating rock for fill into WOTUS.[120] "An agency need not respond to every single scientific study or comment."[121] The Court finds that the Corps' failure to directly address the HighGold report does not render its determination regarding the acid mine drainage potential for the Project arbitrary and capricious.

*b. Portal-Excavated Rock, Potential Portal Seepage, and Blasting Material Sites*

Plaintiffs also maintain that the Corps violated NEPA by failing "to take a hard look at JT Mining's plans to blast and crush bedrock at one of the material sites, excavate a portal with a downward slope, use rock excavated from the portal to build undisclosed project components, and create a waste rock disposal site that is mentioned for the first time in the permit."[122] Plaintiffs suggest that "[e]ach

---

[119] Docket 43 at 24.

[120] *See* Docket 40 at 31.

[121] *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 668 (9th Cir. 2009).

[122] Docket 37 at 37.

of these components has the potential to cause environmental effects, including from potential acid drainage and metals leaching[.]"[123] Plaintiffs maintain that the Corps failed to take a look at the risk of acid mine drainage for each of these specific project activities.

However, as the Court found above, the Corps' conclusion that the material related to the project "appears to be non-acid generating and non-metal leaching" was not arbitrary and capricious.[124] Given this finding regarding the composition of the material, the Corps' failure to specifically address each separate activity of the Project as it relates to acid mine drainage potential was not arbitrary and capricious.

In sum, the Court finds that the Corps' evaluation of the potential for acid draining rock in its NEPA analysis was not arbitrary and capricious. Therefore, Federal Defendants and Intervenor-Defendant are entitled to summary judgment on Plaintiffs' NEPA claim.

### III. Clean Water Act

Plaintiffs contend that the Corps violated the CWA because it "did not resolve uncertainties in the record regarding jurisdictional waters in the material sites."[125] Plaintiffs maintain that "[i]t is not clear" from the maps submitted by JT

---

[123] Docket 37 at 37.

[124] AR000148; AR000966

[125] Docket 37 at 41.

Mining and considered by the Corps that the material sites would be located in uplands and would not impact WOTUS.[126] Plaintiffs cite maps in the record where there "appears to be" a stream or surface water adjacent to or within the boundaries of two material sites.[127] Plaintiffs fault the Corps for not seeking "more precise mapping" to verify the information provided to it by JT Mining.[128]

Section 404 of the CWA mandates that a permit is required before discharging fill into WOTUS.[129] Therefore, the delineation of WOTUS that will be affected by a project is the first step in assessing the potential impacts of a project.

In August 2023, Stantec Consulting Services prepared a Preliminary Jurisdictional Determination for JT Mining, also called a Wetlands and Waters Delineation Report (Delineation Report).[130] The Delineation Report relied on existing data sources, including the National Wetland Inventory (NWI), data from an initial water mapping, and additional field data collected in July and August of 2023.[131] The Delineation Report noted that the "field-verified wetlands and waters loosely corresponded to the NWI mapping," but the NWI mapping mapped "larger

---

[126] Docket 37 at 42.

[127] Docket 37 at 42 (citing AR000607, AR000718, AR000720).

[128] Docket 37 at 43.

[129] *See* 33 U.S.C. §§ 1311(a) (prohibition on discharge into navigable waters), 1362(7) (defining navigable waters as "waters of the United States").

[130] AR000676–77.

[131] AR000682, AR000684, AR000690-93.

wetland floodplains than occur" and "classified the entirety of the alluvial fan area as wetland, while field-verified mapping showed that wetlands did not start to occur until the lower elevations of the fan."[132] The Delineation Report included maps showing the presence of wetlands and waterbodies within the project area, including a stream conceivably within Material Site 5.[133] JT Mining also submitted engineering plans detailing where the road and airstrip would intersect WOTUS. But Plaintiffs contend that the maps do not "show the full extent of the material sites and where they intersect with WOTUS."[134] They add, "[g]iven the foundational importance of determining the extent of jurisdictional waters affected by a proposed action, the Corps' failure to do so is consequential, and is arbitrary and capricious and contrary to law."[135]

In the Memorandum, the Corps noted that the Delineation Report was submitted to the Corps in September 2023 and that it "was reviewed for accuracy."[136] The Corps then "concur[red] with the delineations as represented in the report" and assumed jurisdiction.[137] The Memorandum explained that the project would "discharge a total of 67,800 cubic yards of general embankment fill

---

[132] AR000694.

[133] AR000607; AR000720; *see also* AR000718-21.

[134] AR000614-21; Docket 37 at 42 n.4.

[135] Docket 43 at 29.

[136] AR000123.

[137] AR000123.

and 5,200 cubic yards of surfacing material into 5.14 acres of waters of the U.S. (WOTUS), including wetlands, to construct a portal access road and an upgraded airstrip[.]"[138] Further, to minimize the impact on WOTUS, "[t]he proposed gravel and rock sources (material sites) are in uplands avoiding wetland and stream fill."[139]

Plaintiffs essentially ask the Court to "substitute its judgment for that of the [Corps]" to find that, upon review of the maps before the Corps, JT Mining's development of the material sites would impact additional WOTUS.[140] The Court cannot do so. The Corps' review of the maps "implicates substantial agency expertise"[141] and "[j]udicial review . . . must be at its most deferential 'when an agency makes . . . predictive or scientific judgments.'"[142] Further, JT Mining did not seek a permit to discharge any fill into WOTUS at the material sites and the Permit only authorizes the discharge of fill into WOTUS to build the road and expand the airstrip. In any event, the Cout finds that a reasonable basis exists for the Corps' conclusion that the material sites would not impact WOTUS. JT Mining provided the Corps with a detailed Delineation Report, which the Corps verified

---

[138] AR000120.

[139] AR000122.

[140] *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

[141] *Marsh,* 490 U.S. at 376.

[142] *Ariz. Mining Reform Coal.*, 172 F.4th at 661 (quoting *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 182).

was accurate, and detailed engineering plans showing where JT Mining would discharge fill into WOTUS. The Corps' conclusion that JT Mining's development of the material sites would only implicate uplands is adequately supported by the record and does not constitute "a clear error of judgment."[143] Plaintiffs have not shown that the Corps' failure to secure additional mapping or further explanation from JT Mining rendered the Corps' approval of the Permit arbitrary and capricious.

Plaintiffs also maintain that the Corps violated the CWA because it "did not resolve conflicts in the record regarding the potential for acid rock drainage and heavy metal contamination."[144] However, as explained above in the NEPA discussion, the Court finds that the Corps' conclusion as to the potential for acid rock drainage was not arbitrary and capricious.

In sum, the Court finds that the Corps' conclusion regarding the development of material sites in uplands and its evaluation of the potential for acid draining rock were not arbitrary and capricious. Therefore, Federal Defendants and Intervenor-Defendant are entitled to summary judgment on Plaintiffs' CWA claim.

## CONCLUSION

In light of the foregoing, Plaintiffs' Motion for Summary Judgment at Docket 37 is **DENIED**. Federal Defendants' Cross-Motion for Summary Judgment at

---

[143] *League of Wilderness Defs.*, 549 F.3d at 1215 (quoting *Marsh*, 490 U.S. at 378).

[144] Docket 37 at 44-46.

Docket 40 and Intervenor-Defendant JT Mining's Cross-Motion for Summary Judgment at Docket 42 are each **GRANTED**.

The Clerk of Court is directed to prepare a final judgment and close this case.

DATED this 14th day of September, 2026, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE